# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-4034

CORINNE CIGAN,

*Plaintiff-Appellant,*

v.

CHIPPEWA FALLS SCHOOL DISTRICT,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 03-C-155-S—**John C. Shabaz**, *Judge.*

_____

ARGUED SEPTEMBER 23, 2004—DECIDED NOVEMBER 5, 2004

_____

Before EASTERBROOK, WOOD, and EVANS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* After 30 years' service as a physical-education teacher in Chippewa Falls, Wisconsin, Connie Cigan retired in June 2003. She contends in this suit under the Americans with Disabilities Act that retirement was forced on her by the school district's failure to accommodate her ailments—arthritis, bursitis, degenerating spinal discs, scoliosis, and spondylitis. Suffering from these afflictions, Cigan had begun to take more time off and come to school late; she also needed the school's other teachers to cover her duties or adjust the length of their own class periods while she rested. Cigan and the district disagreed

about the adequacy of the school's accommodations; for example, Cigan insists that until May 2002 the chair supplied so that she could take the breaks her physician recommended was not appropriate to her condition. For its part, the school district concluded that Cigan either had become a slacker or had accumulated so many physical problems that she no longer could do the job even with accommodations—in legal lingo, that she was not a "qualified person with a disability". In January 2003 the superintendent notified Cigan that he would recommend that the district not renew her contract after the end of the 2002-03 school year. Cigan then retired, which improved her benefits package. Now she would like damages and additional pay on top of her retirement benefits. The district court granted summary judgment in the school district's favor.

Cigan wants us to treat retirement as a constructive discharge. (Otherwise it is not clear why she sued, as neither lost wages nor prospective relief could be at issue.) According to *Pennsylvania State Police v. Suders*, 124 S. Ct. 2342, 2351 (2004), "unendurable working conditions" are functionally the same as a discharge. But Cigan does not contend that her working conditions in January 2003 were unendurable, nor did she depart then; she gave six months' notice and left at the end of the academic year. What she contends is that working conditions are irrelevant when a prospect of discharge lurks in the background. Reconciling that position with the Supreme Court's view in *Suders* is not easy. Instead of trying to do so, Cigan insists that this circuit's decisions simply dispense with the standard approach once a discharge is in prospect. She relies particularly on *EEOC v. University of Chicago Hospitals*, 276 F.3d 326, 332 (7th Cir. 2002), in which we wrote: "When an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge."

Language such as this shows the danger of treating an opinion's exposition as if it were statutory text. This sentence generalizes from a situation that met the normal standard: an employee arrived at work only to find that her office had been turned into a storage area, her belongings had been packed up, and her services were no longer wanted. We held that failure to sit in the corridor while waiting for someone to say "you have been fired" did not preclude an employment-discrimination suit. Just so when a professional employee is relegated to menial tasks and the employer makes it clear that no better treatment can be hoped for. Compare *Neal v. Honeywell Inc.*, 191 F.3d 827 (7th Cir. 1999), with *Lindale v. Tokheim Corp.*, 145 F.3d 953 (7th Cir. 1998). Cigan was not turned out of her office or given tasks demeaning to her education and accomplishments. She held the same post and duties that she had found satisfactory for three decades.

This leaves her to contend that a notice of intent to commence a process leading to discharge may be treated, at the employee's election, as a completed discharge, even if the employer does not undermine the employee's position, perquisites, or dignity in the interim. That would take us a long distance indeed from "unendurable working conditions" and require courts to engage in speculation. Even if, as Cigan contends, this superintendent's earlier recommendations had carried the day with the board of education, how could a court know the probability that *this* recommendation would do so? How, indeed, could a judge or jury be confident that the superintendent would not have changed his mind once Cigan responded to the initial proposal? Perhaps Cigan could have shown that she was still able and willing to perform; arrangements and assurances satisfactory to both sides may have been possible. School districts give teachers several opportunities to respond and justify their conduct, and the ADA itself requires a collaborative process to come up with accommodations; to assume at the outset that these ex-

changes are pointless, as Cigan does, is to deny the virtue of statutes and collective bargaining agreements that provide for the exchange. Public schools must offer notice and an opportunity to be heard as a matter of constitutional law. See *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985). It would be odd for courts to say something like: "Well, it's all a sham, so we'll treat the commencement of the process as a final decision to discharge." Then why have the give-and-take at all?

The only way to know how matters will turn out is to let the process run its course. Litigation to determine what *would* have happened, had the employee contested the recommendation, is a poor substitute for the actual results of real deliberation within the employer's hierarchy. A legal rule that employees may leave at the first sign of dissatisfaction also would be incompatible with their duty to mitigate damages, as we observed in *Lindale*. Cigan, who has been idle by choice since June 2003, is hardly in a position to claim back wages for that period.

Nor would equating the *initiation* of discharge proceedings with an *accomplished* discharge benefit workers as a group. Employees have a maximum of 300 days to file a charge of employment discrimination. That time runs from each discrete discriminatory event. See *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). The discrete event in a discharge situation is the formal announcement to the employee that the job will come to an end. See, e.g., *Chardon v. Fernandez*, 454 U.S. 6 (1981); *Delaware State College v. Ricks*, 449 U.S. 250 (1980); *Lever v. Northwestern University*, 979 F.2d 552 (7th Cir. 1992). But if commencement of a termination process is a constructive discharge, then the outset rather than the conclusion is the discrete event, and the time to file a charge is running.

Like other circuits, we have held that the clock starts with the events that constitute a constructive discharge. See,

e.g., *Davidson v. Indiana-American Water Works*, 953 F.2d 1058, 1059-60 (7th Cir. 1992); *Flaherty v. Metromail Corp.*, 235 F.3d 133, 138-39 (2d Cir. 2000); *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1110-11 (9th Cir. 1998). So if Cigan is right, and *every* notice of intent to commence a process that could lead to discharge is a constructive discharge right then and there, a lot of employees who stick it out will be shocked to learn that, when the actual decision is made and communicated, the time to file a charge of discrimination has already expired! The shock would be only slightly less if the rule were limited to notices given by supervisors or managers whose recommendations prevail more than half the time (or, for that matter, more than 90% of the time). Many employees still would be taken unawares, and it would become quite complex to know when the "discrete event" had occurred. Only after discovery would the employee learn how often any given manager's recommendations were accepted, and so only then would the employee know whether a "constructive discharge" had occurred and the time to file a charge had started to run. No one other than lawyers paid by the hour could benefit from such a doctrine. We conclude, therefore, that the prospect of being fired at the conclusion of an extended process is not itself a constructive discharge.

One potential remedy remains to Cigan: compensatory damages for mental distress or physical pain incurred while she remained on the job. The district judge held, however, that Cigan was not "disabled" and thus that the school district did not need to accommodate her condition. Doubtless arthritis and Cigan's other conditions, if sufficiently advanced or debilitating, can impair a person's ability to perform one or more major life activities. Cigan does not contend that her conditions are that bad; she conceded at her deposition that she can carry out the normal tasks of life. See *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002). Instead, she says, the school district regarded

her as disabled, and for most statutory purposes a person regarded as disabled has the same rights as a person who is actually disabled. See 42 U.S.C. §12102(2)(C).

A person is "regarded as disabled" when the employer, rightly or wrongly, believes that she has an impairment that substantially limits one or more major life activities. See *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999); *Dyke v. O'Neal Steel, Inc.*, 327 F.3d 628, 632 (7th Cir. 2003). What does the record show about this possibility? All Cigan says is that, because the district made some efforts at accommodation, it *must* have regarded her that way. Thus the chain of inferences becomes circular: an employer must provide reasonable accommodations to a disabled worker, 42 U.S.C. §12112(b)(5); provision of *any* accommodation shows that the employer regards the worker as disabled; the worker therefore *is* (statutorily) disabled; and so the worker must receive the full set of accommodations appropriate to a genuinely disabled person, not just the tentative or incomplete steps the employer took voluntarily.

Cigan's line of argument supposes that an employer offers accommodation *only if* it thinks that the employee suffers from a substantial limitation in a major life activity. The "only if" is vital; if employers accommodate for other reasons, then the fact of accommodation does not support an inference that a given employer must have regarded a given employee as disabled. Cigan does not try to justify the "only if" clause, and it would not be a sound inference. Decent managers try to help employees cope with declining health without knowing or caring whether they fit the definition in some federal statute. Managers also may respond to state laws, local regulations, collective bargaining agreements, and other norms that go beyond federal law. These may create legal entitlements or practical expectations without implying anything about "disability" under the ADA. Cigan offers no reason to conclude that the principal at her school knew, supposed, or cared anything about the effect of her

conditions on "major life activities" when providing breaks, chairs, and other assistance to continue teaching.

Because the record would not permit a reasonable trier of fact to conclude that the school district regarded Cigan as "disabled," we need not decide whether the ADA requires an employer to accommodate the demands of a person who is regarded as disabled but lacks an actual disability. That is a subject on which decisions are in conflict. Compare *Williams v. Philadelphia Housing Authority Police Department*, 380 F.3d 751, 773-76 (3d Cir. 2004), and *Katz v. City Metal Co.*, 87 F.3d 26, 33 (1st Cir. 1996) (both holding that employees regarded as disabled are not entitled to accommodation), with *Kaplan v. North Las Vegas*, 323 F.3d 1226, 1231-33 (9th Cir. 2003); *Weber v. Strippit, Inc.*, 186 F.3d 907, 916-17 (8th Cir. 1999); *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 (6th Cir. 1999); and *Newman v. East Texas State University*, 161 F.3d 276, 280 (5th Cir. 1998) (all holding otherwise). Being regarded as disabled is a form of disability under the statute and thus could in principle trigger a duty to accommodate, but *what* must be accommodated: any condition that the employer (wrongly) supposes to exist, or only those disabilities that actually afflict the employee? Suppose an employer wrongly believed that anyone who needs glasses is disabled under the ADA. Nearsighted employees at that firm might be "regarded as disabled," but it is hard to imagine that, despite *Sutton* (which held that correctable eye problems are not actually disabling), the employer would have to afford them the sort of accommodations appropriate to a genuine disability. The extent to which employers' errors in appreciating the extent of their workers' real disabilities create obligations to accommodate can be left for another day, however, when the answer could make a difference.

AFFIRMED

**A true Copy:**

      **Teste:**

           _____

           *Clerk of the United States Court of*
           *Appeals for the Seventh Circuit*