In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3143

DARRELL LYNN MILLER,

*Plaintiff-Appellant*,

*v.*

ILLINOIS DEPARTMENT OF TRANSPORTATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:07-cv-00677—**William D. Stiehl**, *Judge.*

ARGUED AUGUST 4, 2010—DECIDED MAY 10, 2011

Before POSNER, ROVNER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff-appellant Darrell Miller worked for five years for defendant-appellee Illinois Department of Transportation (IDOT) as a highway maintainer on a bridge crew. He was fired in June 2007 and then filed this suit alleging discrimination and retaliation in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq*. The district court granted summary judgment for IDOT. We reverse.

Miller has presented evidence from which a reasonable jury could conclude that IDOT regarded him as disabled because of his fear of heights. Miller has also presented evidence that would allow a reasonable jury to find that he could perform the essential functions of his job with reasonable accommodations. Finally, we conclude that there are genuine issues of material fact concerning IDOT's stated reasons for firing Miller.

I. *Relevant Facts and Proceedings*

Because we review a grant of summary judgment, we must consider the evidence in the light most favorable to Miller, the non-moving party. We must give him the benefit of any conflicts in the evidence and any reasonable inferences that might be drawn in his favor. *E.g.*, *Winsley v. Cook County*, 563 F.3d 598, 602-03 (7th Cir. 2009).

Miller began working for IDOT in 2002 and was assigned to the bridge crew based in Dongola, Illinois, near the southern tip of the state. A bridge technician and four other highway maintainers were also assigned to the same crew. As a highway maintainer assigned to a bridge crew, Miller was responsible for a variety of tasks, many of which could be performed from the ground. Those tasks included operating and repairing maintenance vehicles and equipment, including trucks, pavement marking equipment, tractors, mowers, snow plows, and jack hammers; maintaining large culverts, abutments, guardrails, and drainage installations; spreading salt, sand, gravel, and asphalt; directing traffic

during maintenance operations; cutting grass, weeds, and brush; repairing signs and digging post holes; cleaning and maintaining the crew's headquarters; disposing of trash and highway debris; and record-keeping. Some of the bridge work, of course, required working at some height above the ground or water. The highway maintainers on the bridge crew also had to chip, seal, and clean bridges, and clean and paint bridge bearings.

From the outset of his employment, Miller had occasional difficulty working from heights, particularly when he worked in an unsecured environment. When he began work he had not been formally diagnosed with acrophobia, but Miller informed IDOT and the lead worker of his bridge team, Steve Maurizio, that he had a fear of some heights and that there were a few tasks that he would not be able to do. Specifically, he informed Maurizio that he would not be able to "walk a bridge beam." In spite of his fear, Miller was able to perform work in an elevated, hydraulically lifted "snooper bucket" at heights of up to 80 feet, and he was able to crawl on the arch of a bridge on a catwalk. He estimated that his fear would be triggered and he would have problems with less than three percent of his job description, but even then he was able to complete his assigned tasks on all but one occasion.

Until early 2006, IDOT informally accommodated Miller by allowing other members of his team to handle those tasks for him, just as other team members' conditions or limitations were accommodated. For example, Maurizio was unable to weld. Another co-worker

refused to ride in the snooper bucket, was not required to climb the arches of an interstate bridge linking Illinois to Kentucky, was unable to spray bridges because of his allergies, was not required to mow the yard, and was not required to rake patching debris. Other crew members would swap assignments as needed to enable the crew to complete those tasks. In short, the evidence would allow a jury to find that the team worked effectively as a team, taking advantage of each member's abilities and accommodating each member's limitations.

Miller worked successfully as a highway maintainer on the bridge crew without incident for several years. Then, on March 10, 2006, Miller's crew was working on a bridge in Marion, Illinois. The crew was installing pieces of plywood underneath the bridge as a protective shield to protect the road below from falling pieces of concrete. The crew's bridge technician, Kenneth Greenlee, assigned Miller to go up in a snooper bucket from which he would nail wood beams to the bridge flanges and then nail plywood sheets to the beams. This assignment required Miller to unhook his lifeline and work unsecured. He completed his assigned task, but he later filed a grievance because he believed he had been ordered to perform an unsafe task.

Less than two weeks later, on March 23, 2006, Miller's bridge crew was changing light bulbs on a bridge that crosses the Mississippi River. Crew leader Maurizio assigned Miller and another crew member to "go over the edge" of the bridge to change the navigation light bulbs directly above the river. Miller had to climb down

a ladder on the side of the bridge to reach the station that held the light fixtures. Some of the stations would have required him to stand on a bridge beam while wearing a lifeline. When Miller attempted to change a bulb that would have required him to stand on a bridge beam, he was unable to complete the task. He suffered a panic attack and was taken by ambulance to a hospital. That was the first, last, and only time Miller was unable to complete an assigned task because of his fear of heights.

IDOT's response to that incident is central to whether it regarded Miller as disabled. IDOT placed Miller on sick leave and ordered him to submit to a fitness-for-duty examination. IDOT's examiner, Dr. Byron Gorton, diagnosed Miller with acrophobia and concluded that he was unfit to work as a highway maintainer. An IDOT administrator told Miller that he needed to request non-occupational disability status or he would "get nothing." Miller made the request, and IDOT placed Miller on non-occupational disability status on June 23, 2006.

Miller described his limitation as being unable to work at heights above 20 to 25 feet in an exposed, extreme position. IDOT documents reflect that, from the time it received Dr. Gorton's diagnosis, it treated Miller as if his condition imposed much more extensive limits, as if he were unable to work above any height greater than 20 feet. A June 21, 2006 memorandum (author unknown) to Angie Ritter, an IDOT personnel manager, explained, describing the work required in the bridge section of the bridge crew:

> Working in the Bridge Section requires working above 20' regularly. 75% of Highway Maintainers work time is spent working on bridge structures. Bridge deck patching often requires full depth holes through the deck that exposes the crew to this hazard. Any work in the snooper truck, on bearings, piers, navigation lights, chipping concrete, etc. requires some exposure to heights. Traffic control, brush removal and yard maintenance are also included in the HM's assignments that would not normally include this exposure. However, flagging on a bridge or clearing brush on a steep slope could also be perceived as a height exposure.

The memorandum concluded that the traffic section and maintenance team section of the bridge crew would also be off-limits to someone unable to work at heights above 20 feet.

Miller filed a grievance challenging Dr. Gorton's conclusion that he was unfit to perform his duties. On July 2, 2006, Miller also filed a request for reasonable accommodation, requesting that he not be required to work "on bridge beams and other extreme places over 20-25'—Bridge piers or skeletal structures (frames) and other places—ex. snooper bucket, etc.," and that he be transferred from Dongola to the IDOT yard in Anna, Illinois. In response, personnel manager Ritter told him, "I'll tell you right now, we don't grant requests."

Miller supported his grievance and request for accommodation with the independent evaluation of psychiatrist Dr. William Mings, who opined that Miller could con-

tinue to perform the functions of his job if IDOT provided him with the same reasonable accommodation that it had in the past. In November 2006, the Illinois Retirement System required Miller to be examined by another psychiatrist, Dr. Klamath, who also found that Miller was fit for work and should be returned to work with whatever minor accommodations might be required.

Miller's request for accommodation was formally denied on January 16, 2007. On May 1, 2007, however, Miller was ordered back to work, and the events of his return are central to his retaliation claim. Miller reported to the Carbondale District Nine IDOT office. There he encountered Angie Ritter. Referring to Ritter, Miller then said to another employee: "Right there is Arch enemy Number 1. I have never hit a woman. Sometimes I would like to knock her teeth out." IDOT construed Miller's comment as a threat, informed Miller that he had been relieved of duty, and instructed him to go home.

On June 20, 2007, Miller was formally discharged for making a threat of violence against another employee and for disruptive behavior. Miller grieved his discharge, and the parties submitted to arbitration. Miller was found to have engaged in "conduct unbecoming" but was returned to work, without back pay or benefits, on November 19, 2008.

Miller then filed this suit under the Americans with Disabilities Act. He alleged that IDOT had discriminated against him by failing to provide an accommodation and terminating him. He also alleged that IDOT had illegally retaliated against him for requesting an accom-

modation. IDOT moved for summary judgment. In response, Miller presented evidence that Maurizio had threatened violence against his co-workers on more than one occasion—including one incident in which he threatened to kill three co-workers—but unlike Miller, was not disciplined or terminated for his behavior.

The district court granted IDOT's motion on both claims. The district court found that Miller's discrimination claim could not survive because Miller's requested accommodation—rearranging job tasks among members of the bridge crew—was unreasonable, and that working at heights above 25 feet was an essential function of Miller's job on the bridge crew. The district court then found that Miller's retaliation claim failed because he had not provided sufficient evidence that IDOT's given reason for terminating his employment was pretextual. We reverse because all three of these findings are subject to genuine disputes of material facts.

II. *Discussion*

  A. *"Regarded as" Disabled*

The ADA prohibits discrimination only against a "qualified individual with a disability." 42 U.S.C. § 12112(a). To succeed on his ADA claim, Miller must demonstrate that he was protected under the Act. We first determine whether Miller presented sufficient evidence from which a reasonable jury could conclude that he was an individual with a disability within the meaning of the statute.

"Disability" is defined as (a) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment. 42 U.S.C. § 12102(2). In the district court and on appeal, Miller has argued that he satisfies the "regarded as" prong of the ADA definition of disability. To satisfy that prong of the definition, Miller had to offer evidence indicating that IDOT believed, rightly or wrongly, that he had an impairment that substantially limited one or more major life activities. 29 C.F.R. § 1630.2(*l*); see also *Cigan v. Chippewa Falls School Dist.*, 388 F.3d 331, 335 (7th Cir. 2005). IDOT had to "believe either that [Miller had] a substantially limiting impairment that [he did] not have or that [he had] a substantially limiting impairment when, in fact, the impairment [was] not so limiting." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999); see also *Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 954 (7th Cir. 2000).

Miller argues that IDOT regarded him as substantially limited in the major life activity of working. We have stated that working can be a major life activity under the ADA. See *Peters v. City of Mauston*, 311 F.3d 835, 843 (7th Cir. 2002). Although the Supreme Court reserved judgment on the question, see *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 200 (2002), IDOT has not asked us to reconsider our position under the law applicable at the relevant time.

To have been regarded as substantially limited in his ability to work under the law in effect at the

relevant time, Miller must come forward with evidence that IDOT regarded him as limited in his ability to perform not merely one particular job but a class or broad range of jobs. See 29 C.F.R. § 1630.2(j)(3)(i); *Toyota Motor*, 534 U.S. at 200 (if working is determined to be a major life activity under the ADA, a claimant will be required to show "an inability to work in a broad range of jobs"); *Sutton*, 527 U.S. at 493-94 (plaintiffs with vision impairment were not "regarded as" substantially limited in major life activity of working because they failed to show employer regarded their impairment as precluding them from a substantial class of jobs); *Kuptas v. City of Greenwood*, 398 F.3d 609, 612-13 (7th Cir. 2005) (following *Toyota Motor*); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998) (under "regarded as" theory of disability, "the employer's perception of the plaintiff's inability to work" must have a breadth comparable to ADA's requirements for actual disability).[1]

---

[1] Congress responded to these and similar decisions by enacting the ADA Amendments Act of 2008, which provided, among many important changes, that a person can satisfy the "regarded as" definition of disability if the person "has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." Pub. L. 110-325 §4, amending 42 U.S.C. § 12102(3)(A). The amendments did not take effect until January 1, 2009, so we consider here the statutory and regulatory provisions as they stood before the 2008 amendments.

The ADA regulations call for consideration of a number of factors in applying this test, including the nature and severity of the perceived impairment; the duration or expected duration of the perceived impairment; and the permanent or long-term impact, or expected permanent or long-term impact, of the impairment. 29 C.F.R. § 1630.2(j)(3)(ii). Other factors specific to the major life activity of working include the geographical area to which the person has reasonable access; "the job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment;" as well as the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment. *Id.*

This was a demanding standard, but the "regarded as" prong is an important protection that should not be nullified by creating an impossibly high standard of proof, as Congress indicated even more strongly in the 2008 amendments. Even under the earlier law, for example, it is not necessary for an employee to show that the employer consciously conducted the same sort of full statutory analysis that a trial judge or jury would conduct in a case of actual impairment. An employer who is irrationally and illegally overreacting to a perceived disability is unlikely to carry out consciously the full ADA analysis.

If the employee contends he was regarded as substantially impaired in the major life activity of working, he must present evidence from which it could be inferred that the employer regarded him as facing restrictions that would be significant enough to restrict his ability to meet the requirements of a substantial class of other jobs, beyond his current job. The real problem here is one of proof. How broadly did the employer, subjectively, view the person's impairment?

The Supreme Court addressed a similar problem of subjective knowledge under the Eighth Amendment in *Farmer v. Brennan*, 511 U.S. 825 (1994). The Eighth Amendment prohibits prison and jail officials from acting with "deliberate indifference" to a prisoner's basic, minimal needs for health and safety. In *Farmer* the Supreme Court held that "deliberate indifference" refers to the prison official's subjective state of mind, requiring proof that the prison "official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837.

The *Farmer* Court went on to explain, however, that whether the defendant official had "the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id*. at 842. Thus, a jury can infer that an official had actual knowledge of a risk based on evidence that the risk was obvious. *Id*.

Similarly here, the issue of the employer's subjective perception of the degree of Miller's impairments can be

addressed through circumstantial evidence, including reasonable inferences based on the evidence of the employer's perceptions of Miller's impairments. Quantitative evidence of the local job market may be helpful, as the regulations indicate, but is not indispensable.

In this case, Miller offered sufficient evidence from which a reasonable jury could conclude that IDOT regarded him as precluded from a substantial class of jobs. When Miller began working for IDOT as a highway maintainer on the bridge crew, and before he was formally diagnosed with acrophobia, his supervisors and co-workers were aware that he was unable to work at heights in exposed positions. During the next four years from his hire until the spring of 2006, IDOT and Miller's bridge crew supervisors permitted him to swap tasks among his fellow crew members so that he could avoid the occasional task that he was unable to do.

After the March 23, 2006 panic attack above the Mississippi River, Miller was formally diagnosed with acrophobia. IDOT immediately precluded him from performing any task required of the bridge crew, even tasks that could be performed from the ground—let alone from a secure, unexposed height. IDOT forced him on non-occupational disability leave and exaggerated the relatively modest effects of the acrophobia. Even after two psychiatrists cleared him for work without any significant restrictions, IDOT continued to preclude Miller from returning to any and all tasks performed by the bridge crew. According to the record, those tasks included everything from the maintenance and operation

of vehicles and equipment to spreading salt and gravel, cutting grass, and directing traffic. In other words, IDOT treated Miller as though he was unable to perform a wide range of jobs. A reasonable jury could find from this evidence that IDOT regarded Miller as disabled by his acrophobia under the law before the 2008 amendments. We proceed to consider the other contested elements of Miller's ADA discrimination claims.

B. *Essential Function and Reasonable Accommodation*

The ADA requires an employer to make reasonable accommodations that will allow a "qualified individual with a disability" to perform the essential functions of his or her job. 42 U.S.C. § 12112(b)(5)(A). IDOT argues that working above 25 feet in an extreme or exposed position is an essential function of members of the bridge crew and that Miller's requested accommodation was unreasonable. The district court agreed and granted summary judgment for IDOT on this basis. Viewing the evidence in the light reasonably most favorable to Miller, a reasonable jury could find that such work was not an essential function of the job and that Miller was requesting a reasonable accommodation: after all, he was asking only that he be allowed to work as he had worked successfully for several years.

We first consider whether there is a genuine dispute of fact as to whether working above 25 feet in an extreme position was an essential function of Miller's job as a highway maintainer on the bridge crew. We first look to

the federal regulations, which instruct us to consider the following categories of evidence:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

See 29 C.F.R. § 1630.2(n)(3). Under this standard, the employer's judgment is an important factor, but it is not controlling. Under factors (vi) and (vii), we also look to evidence of the employer's actual practices in the workplace.

We are confident that some high work in exposed or extreme positions is an essential function of the bridge crew as a whole. IDOT would have us take that point a step further to find that any individual assigned to the bridge crew had to be able to perform each and every task of the entire bridge crew. That would require finding that every task required of the bridge crew as a whole was an essential task of each bridge crew member. On

this record, we cannot make that finding as a matter of law. Plaintiff has come forward with substantial evidence showing that his bridge crew did not actually work that way. The bridge crew worked as a team. No one person was assigned permanently to any one task. Although individual members of the team did various tasks as needed, there was no requirement that the bridge crew members rotate from task to task in an organized, routine fashion, such that it was necessary for any one member of the bridge crew to be able to do every task of the bridge crew as a whole.

Miller has presented evidence that, at least prior to March 23, 2006, the team accommodated the various skills, abilities, and limitations of the individual team members by organizing itself according to those skills, abilities, and limitations. Maurizio could not weld, so the other members did the welding when it was required. Another co-worker refused to ride in the snooper bucket, so those tasks, when needed, went to others. This was also true of bridge spraying, yard mowing, and debris raking for a crew member with allergies.

As in other "team" environments, the individual members took on tasks according to their capacities and abilities. Here, a reasonable fact-finder would have to conclude that *some* members of the bridge crew had to be able to work at heights in exposed or extreme positions so that the bridge crew—as a unit—could do its job, just as some members of the crew had to be able to weld, ride in the snooper bucket, spray, mow, and rake. That conclusion does not mean that the fact-finder would be

required to conclude that *each* member of the bridge crew had to be able to do *every* task required of the entire team. In terms of the regulation, the evidence of actual experience of past and present incumbents in the job and similar jobs conflicts with the employer's judgment about which functions are essential. See 29 C.F.R. § 1630.2(n)(3). On this record, a reasonable jury could find that working at heights in an exposed or extreme position was not an essential function for Miller as an individual member of the bridge crew.

From this same evidence, a reasonable jury could find that Miller's request for accommodation—that other members of his team substitute for him when a task required working above 25 feet in an exposed or extreme position—was reasonable. The statute provides that the term "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B).

The ADA does not give employers unfettered discretion to decide what is reasonable. The law requires an employer to rethink its preferred practices or established methods of operation. Employers must, at a minimum, consider possible modifications of jobs, processes, or tasks so as to allow an employee with a disability to work, even where established practices or methods seem

to be the most efficient or serve otherwise legitimate purposes in the workplace. See, *e.g., Vande Zande v. State of Wisconsin Dep't of Administration*, 44 F.3d 538, 542 (7th Cir. 1995) ("It is plain enough what 'accommodation' means. The employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work.").

When considering other work environments, we have upheld determinations that requests for a "helper" employee and requests to rotate work tasks were unreasonable. For instance, in *Lenker v. Methodist Hospital*, 210 F.3d 792 (7th Cir. 2000), a nurse with multiple sclerosis was unable to lift patients. He requested that he be permitted to use assistive devices or call for help when he was unable to lift a patient. On review, we upheld the jury's verdict in favor of the employer. We found sufficient evidence in the record from which the jury could reasonably find (a) that assistive devices might help to lift a patient out of bed but would not help a patient walk down the hall or to the bathroom, and (b) that other staff would not be able to assist at all times, particularly in a staff shortage or a hospital emergency. See *id*. at 796-97.

In another case, we upheld summary judgment against an equipment operator who suffered a shoulder injury and was no longer able to lift or carry anything over fifty pounds. See *Peters v. City of Mauston*, 311 F.3d 835, 840 (7th Cir. 2002). That employee also requested that his employer permit another employee to help him with

the lifting requirements of his job. We found that the request was unreasonable because lifting and carrying were essential functions of his job as an equipment operator. Making the accommodation would have required another person to perform an essential function of the employee's job. See *id*. at 845; see also *Miller v. Illinois Department of Corrections*, 107 F.3d 483, 485 (7th Cir. 1997) ("if an employer has a legitimate reason for specifying multiple duties for a particular job classification, duties the occupant of the position is expected to rotate through, a disabled employee will not be qualified for the position unless he can perform enough of these duties to enable a judgment that he can perform its *essential* duties") (emphasis in original); *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 912 (7th Cir. 1996) (holding that employee's request that employer hire a helper to perform essential function was unreasonable; "hiring a helper to perform the overhead work would mean the helper would de facto perform [the employee's] job. We cannot agree that [the employee] would be performing the essential functions of his job with a helper.").

These cases teach that task reassignments within a job can be unreasonable in situations where the reassigned task is an essential function of the job. In those situations, reassignment or delegation of the task would equate, essentially, to reassignment or delegation of the job itself.

What sets this case apart from those earlier cases is Miller's evidence that it was in fact the normal course for individual members of the bridge crew to substitute and reassign tasks among themselves according to indi-

vidual abilities, preferences, and limitations. Miller's request for reasonable accommodation did not ask IDOT to do anything it was not already doing (or, at least, anything it had not been doing up until March 2006). The record on summary judgment, taken in the light reasonably most favorable to Miller, does not compel a finding that IDOT required every employee working as a highway maintainer on a bridge crew to be able to work in an exposed or extreme position above 25 feet in the air or that being able to do so was an essential function of the job. To the contrary, the record confirms that it was a regular occurrence for individuals on the bridge team to share and swap tasks according to their individual capacities, abilities, and limitations. Miller's request that task assignments be adjusted among the bridge crew members so that he would not be confronted with a task requiring him to work above 25 feet in an exposed or extreme position did not amount to a request that another member of the team perform an essential, non-delegable task. A jury should be permitted to consider Miller's actual work environment and IDOT's past flexibility in delegating tasks amongst the bridge team members in deciding whether Miller's request for accommodation was reasonable.[2]

_____

[2] We recognize that if most or all members of a bridge crew had acrophobia like Miller's, the crew could not perform all of its essential duties. If and when such an extreme case might arise, we are confident that the law would accommodate an employer's need to get its work done. In this case, how-

(continued...)

C. *Retaliation*

The district court also granted summary judgment for IDOT on Miller's ADA retaliation claim. To avoid summary judgment on his retaliation claim, Miller must offer evidence that he engaged in protected activity, that he was performing his job satisfactorily, and that he was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not suffer. See *Squibb v. Memorial Medical Center*, 497 F.3d 775, 788 (7th Cir. 2007); *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002). The district court found that Miller failed to demonstrate that IDOT's stated reason for firing him—the alleged threat against Ritter when he returned to work—was pretextual. Here, too, we reverse.

In reviewing the evidence, we cannot second-guess IDOT's employment decisions to the extent that they were innocently unwise or unfair. But Miller has presented sufficient evidence from which a finder of fact could genuinely call into question IDOT's honesty. First, a reasonable jury could find that Miller's statement about Ritter was not a "threat" at all, or that even if IDOT properly construed it as such, its decision to terminate Miller was a disingenuous overreaction to justify dismissal of an annoying employee who asserted his rights under the ADA. Miller presented evidence that

---

[2] (...continued)

ever, the evidence showing that plaintiff had actually been accommodated as he requested shows that the employer is not entitled to summary judgment on this theory.

Maurizio himself had had a genuinely violent workplace outburst but was not terminated, and yet Miller was terminated for a much milder comment on his first day back at work.[3] Also, Ritter's comment to Miller that "we don't grant requests" could be construed by a reasonable jury as showing a general hostility to requests for accommodation under the ADA. There is more here than "mere temporal proximity." Cf. *Stone*, 281 F.3d at 644) (noting that "mere temporal proximity between the protected conduct and the allegedly retaliatory act "will rarely be sufficient in and of itself to create a triable issue"). The combination of the ambiguity of the asserted threat, the response to Maurizio's violent outburst, the hostility toward Miller's request for accommodation, and the timing provided sufficient evidence to permit a reasonable trier of fact to infer pretext and retaliatory intent. The question must be decided at trial rather than on summary judgment.

REVERSED AND REMANDED.

---

[3] At oral argument, defense counsel suggested that IDOT's management had not known of Maurizio's violent outburst, so that its failure to take action against Maurizio cannot be evidence of pretext. However, that issue was not raised before the district court on summary judgment and is not otherwise reflected in the record. On remand, the parties will have the opportunity to present evidence on that point.