McKEAGUE, Circuit Judge,
dissenting.
I respectfully disagree with the conclusion that a reasonable jury could find that the Cleveland Clinic Foundation constructively discharged Farley Lee, let alone terminated her. Likewise, I see no genuine dispute as to whether the Clinic disciplined Lee because she made vague discrimination complaints rather than due to her own misconduct. Because Lee has not shown she suffered an adverse action necessary to sustain her discrimination claims or a genuine dispute over whether the Clinic’s reasons for its actions are a pretext for unlawful retaliation, I would affirm.
I
The majority provides some factual background, but to explain why summary judgment is proper requires more context. In particular, it requires some knowledge about Lee’s history with interpersonal problems at work. In August 2013, Lee’s fellow nurses reported to Joselyn Meyer— Lee’s boss—that Lee had called a patient a “fat pig” and was not acting “like herself.” Meyer discussed this incident with Lee, who now claims that the other nurses concocted the story and actually made the “fat pig” comments themselves. Lee concedes, however, that she called the patient “obnoxious” and left his charts uncompleted. The same month, Lee also offended a supervisor by accusing her, in an emotionally charged exchange, of trying to discharge a patient prematurely. Lee acknowledges that she generally received criticism on how she addressed coworkers.
In November 2013, the Clinic removed Lee as a patient’s caregiver after the patient’s wife grew upset over how Lee responded to questions about her husband’s treatment. Notes in Lee’s personnel file indicate that the wife complained that Lee was rude, talked over her, and cut her off when she spoke. The wife was particularly vulnerable as she was receiving chemotherapy treatment herself.[1] Lee claims the wife overreacted but confirms that another nurse reported Lee’s interaction with the woman to the Clinic and “made a big story about it[.]” R. 33-3, Lee Dep., 121, PID 1545. Meyer spoke with Lee about the conflict the next day to counsel her on how to handle dissatisfied clients. Meyer’s records say that she warned Lee that further incidents with patients might lead to a corrective action.[2]
Lee’s 2013 performance review, despite saying positive things about Lee, stated that she came “across as harsh when she interacts with patients and colleagues[.]” R. 33-4. Lee Dep., at 130, PID 1554. Additionally, she received her lowest ratings for her ability to accept constructive feedback. Lee acknowledges that coworkers *503 reported her behavior frequently, but she feels the incidents complained about were “little piddly things[.]” Id. at 131-33, PID 1555-57.
With this background in mind, we come to April 10, 2014, when Lee admits she told a patient to prearrange her own medication needs with a doctor because Lee did not have the time to deal with it. Lee sees no problem with how she treated this patient, but a coworker told Meyer that Lee had been pushy and abrasive. Four days later, Lee almost sent a patient into an operation without properly preparing an intravenous medicine mixture. Lee then asked the patient’s family to keep her error “discreet” and placed blame at least partially on a nursing student. Lee claims that she only wanted to protect the nursing student’s feelings, not to cover up the incident. She admits, however, that another nurse reported the incident to the Clinic differently.
The next day, Meyer called Lee into her office to discuss accusations that Lee had been pushy or abrasive with a patient. Lee says she responded by accusing Meyer of age and race discrimination. At the end of April, the Clinic’s management issued Lee a corrective action and put her on a performance plan citing the need for her to improve her interpersonal skills with patients and coworkers as well as her ability to accept constructive criticism. Presented with this critique, Lee refused to sign the plan, complained that “she was not appreciated for anything,” and told her managers that the Clinic focused “on little problems that the patients should not even be mad about.” R. 33-4, Lee Dep., 179-83, PID 1603-07.
On July 14, 2014, while under her performance plan, Lee was responsible for monitoring a patient with an abdominal aortic aneurysm. If such an aneurysm were to rupture, the patient must undergo an emergency surgery which only twenty percent of patients survive.[3] Due to the potential risks posed by aortic aneurysms, nurses caring for a patient with this condition must monitor the patient’s blood pressure closely. As Lee knew from her training, the Clinic required nurses to notify a doctor immediately if the blood pressure rose above a certain level. At around 10:00 a.m., Lee recognized that her patient registered above this critical point, yet she only reached a doctor about three hours later. Lee blames a secretary for the error.
On Friday, July 18, the Clinic issued Lee a second corrective action, citing this incident and yet another from April where she had mismanaged lab results. She refused to sign this corrective action as well. Lee then undisputedly discussed her discipline with the very aneurysm patient to whom she provided substandard care, telling the patient that she may be terminated for the incident. After the Clinic heard reports that Lee confronted the patient, Meyer suspended Lee for three days pending an investigation. Before Lee served any of her suspension, she resigned.
II
My first disagreement with the majority lies with its decision to resurrect Lee’s discrimination claims. Under both Title VII and the ADEA, Lee must show that she suffered an “adverse employment action.” Mensah v. Michigan Dep’t of Corr., 621 Fed.Appx. 332, 334 (6th Cir. 2015) (citations and quotation marks omitted); see Mitchell v. Vanderbilt Univ., 389 F.3d 177, 182 (6th Cir. 2004). That is, some *504 action by her employer that constitutes “a materially adverse change in the terms of’ her employment. Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 885 (6th Cir. 1996). Events like “[t]ermination, decrease in wage or salary, change in title, diminished material responsibilities, or a material loss of benefits” all count. Id.
The majority sees two possible adverse actions here. First, it thinks a jury could find that Meyer fired Lee. Second, it believes a jury could find that the Clinic intentionally created a harassing environment to force Lee out. The evidence supports neither theory.
A
To start, thé majority unreasonably construes unambiguous facts to find a dispute as to whether the Clinic terminated Lee. Maj. Op. at 494-95. For the majority, a dispute apparently arises because Lee characterized Meyer as saying “Never come back to work again until I call for you,” or “Don’t make yourself known in the CCF main campus or go to your locker ever.” R. 35-5, 284, PID 1750. Our question on summary judgment, however, is not whether an isolated phrase fropi a deposition supports an argument when presented without context. Instead, we ask whether a plaintiff produced sufficient evidence to permit a reasonable jury to find for her on a claim’s element. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (holding that there is no genuine issue “for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party”) (citations omitted). Here, Meyer undisputedly prefaced her comments with an unequivocal statement that Lee was suspended for three days pending an investigation.[4] Further, Lee undisputedly sent the Clinic a signed resignation letter after this conversation.
A termination is not a premonition or a subjective feeling that an employee gets from an interaction with her supervisor. Rather, it is a discrete event that ends a legal relationship. See Termination of Employment, Black’s Law Dictionary (10th ed. 2014) (“The complete severance of an employer-employee relationship.”). To terminate the relationship, a party must manifest its intent in a way that an objective listener would understand as ending that relationship. Cf. Barbara T. Lindemann, Paul Grossman & C. Geoffrey Weirich, Employment Discrimination Law 21.IV.A (Bloomberg BNA, 5th ed. 2012) (“Normally, it is obvious whether a discharge has occurred: Has the employer affirmatively extinguished the employment relationship, or not?”). Lee must present sufficient evidence to permit a reasonable jury to find Meyer manifested an intent to affirmatively extinguish and completely sever Lee’s relationship with the Clinic.
Lee simply has not presented such evidence. We do not need to resolve a he-said, she-said dispute to see the answer here. Meyer undisputedly told Lee that she was suspended for three days pending a full investigation. The Clinic’s internal emails even refer to Lee as “suspended.” It would be truly odd to find that Meyer, despite her use of the word “suspended,” nevertheless objectively manifested an intent to “completely sever” the employment relationship. No reasonable person could make that inference.
*505 In fact, there is no evidence anyone actually drew that inference. Lee did not. She undisputedly sent the Clinic a signed resignation letter that purported to be effective the day before her suspension started—bizarre behavior for someone who thought herself “fired.” Tellingly, even the majority exposes how contrived this “dispute” is, as it cannot help but refer to Lee as having “resigned” throughout its opinion. See Maj. Op. at 491-92, 496, 496-97. Lee’s testimony arguably supports—at most—that she had a subjective belief about future termination. But the word “reasonable” loses all meaning when the majority asserts that a “reasonable” jury could infer that Meyer terminated Lee.
B
Perhaps hardly expecting that the court would buy her actual-termination argument given that she sent the Clinic a signed resignation letter, Lee also contends that the Clinic constructively discharged her. She relies on two strands of constructive-discharge case law for alternative arguments. The first strand she misconstrues, and the second sets a bar for mistreatment that she simply cannot meet on the facts presented. The district court correctly found that no genuine dispute exists in relation to either argument.
Lee first says that because she “reasonably believed” her suspension would end in termination, the Clinic constructively discharged her. She points to case law saying that a constructive discharge could have occurred where a plaintiff resigned with “the understanding that he did not have the option of continued employment.” See Scott v. Goodyear Tire & Rubber Co., 160 F.3d 1121, 1128 (6th Cir. 1998). That is, “when the employee reasonably believed his termination to be imminent.” Harris v. Butler Cty., Ohio ex rel. its Sheriff’s Dep’t, 344 Fed.Appx. 195, 199 (6th Cir. 2009) (describing Ford v. Gen. Motors Corp., 305 F.3d 545, 554 (6th Cir. 2002)).
But as with her actual-termination argument, Lee merely presents quotes without context. We have used these constructive-discharge formulations she cites in cases where an employer pushes financial pressure points to coerce an employee into retiring. See Scott, 160 F.3d at 1127 (finding that a constructive discharge would occur if a company coerced an employee to retire by offering him either (1) voluntary retirement with benefits, a lump sum, and retirement payments or (2) an involuntary lay off without benefits and an only illusory chance to be rehired); Ford, 305 F.3d at 554 (holding that where a plaintiff faced an escalating disciplinary campaign and heard he would be fired if he “sneezed,” the company could foresee he would retire to keep his pension).
These cases comport with the general understanding that a constructive discharge occurs when an employer intentionally makes work “intolerable.” See Wright v. Illinois Dep’t of Children & Family Servs., 798 F.3d 513, 528-29 (7th Cir. 2015) (comparing and contrasting Seventh Circuit cases under an analogous strand of constructive-discharge case law). But “a working condition does not become intolerable or unbearable merely because a ‘prospect of discharge lurks in the background.’” Chapin v. Fort-Rohr Motors, Inc., 621 F.3d 673, 679 (7th Cir. 2010) (quoting Cigan v. Chippewa Falls Sch. Dist., 388 F.3d 331, 333 (7th Cir. 2004)). And Lee has not presented any evidence of a financially coercive scheme that made quitting profitable for her.
Instead, Lee wants these cases to say that she could quit because she felt that her discipline was a farce that would inevitably lead to her termination. The case law, however, rejects the proposition that an employee can short circuit an employ *506 er’s disciplinary procedures and then litigate whether the outcome would have been preordained. See Agnew v. BASF Corp., 286 F.3d 307, 310 (6th Cir. 2002) (rejecting the argument that “termination would have been the inevitable result” of a performance plan); Cigan, 388 F.3d at 333-34 (rejecting the argument that “a notice of intent to commence a process leading to discharge may be treated, at the employee’s election, as a completed discharge”). As the Seventh Circuit explained in rejecting an argument like Lee’s, “[t]he only way to know how matters will turn out is to let the process run its course.” Cigan, 388 F.3d at 333. Litigation where parties speculate over what may have happened is a poor substitute for the employer’s actual processes and a concrete decision. See id. at 333-34.
The majority’s analysis on Lee’s other purported adverse actions seems instructive on this point too. The majority correctly concludes that Lee cannot rely on an unpaid suspension that she never served to show an adverse action. Maj. Op. at 496-97. And it reaches this result by citing the principle that an employee “is obliged not to assume the worst, and not to jump to conclusions too fast.” Id. (citing Agnew, 286 F.3d at 310) (quoting Garner v. Wal-Mart Stores, Inc., 807 F.2d 1636, 1639 (11th Cir. 1987)). Then, it observes that in this instance Lee “resigned before she could serve the suspension.” Maj. Op. at 497 (emphasis added).
The same reasoning applies to Lee’s constructive-discharge argument. Lee admits that Meyer told her she was suspended pending investigation of reports that Lee confronted the aneurysm patient about Lee’s second corrective action. Lee did not have the option to quit and then litigate whether the Clinic would have ignored an investigation that could have potentially exonerated her. Allowing her to do so is to endorse unbridled speculation.
With respect to the second strand of cases, Lee’s facts simply do not show the level of mistreatment necessary to qualify as a constructive discharge. “To demonstrate a constructive discharge, the plaintiff must show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; (2) the employer did so with the intention of forcing the employee to quit; and (3) the employee actually quit.” Hurtt v. Int’l Servs., Inc., 627 Fed.Appx. 414, 420 (6th Cir. 2016). We look to various factors to establish whether a reasonable person felt compelled to resign. See Logan v. Denny’s, Inc., 259 F.3d 558, 569 (6th Cir. 2001) (“(1) demotion, (2) reduction in salary, (3) reduction in job responsibilities, (4) reassignment to menial or degrading work, (5) reassignment to work under a younger supervisor, (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee’s resignation, or (7) offers of early retirement or continued employment on terms less favorable than the employee’s former status”) (citation omitted).
Contrary to the majority’s analysis, the comments excerpted in Logan do not set some “offensiveness threshold” that makes harassing comments actionable as a constructive discharge. See Maj. Op. at 495-96. To start, the employee in Logan allegedly faced more than comments—her employer allegedly demoted her, reduced her salary, and reassigned her to demeaning work after beckoning her to the office with a fake assignment meant to mock her. See generally Logan, 259 F.3d 558. Moreover, the employee in Logan faced multiple racially abusive incidents over a two-month stint in her new location with a company that the court deemed notoriously abusive. See generally id.
*507 Rather than asking whether coworkers’ statements meet some Logan threshold, the proper threshold question in a constructive discharge case based on harassment is whether the plaintiff has shown mistreatment that rises to the level of a hostile work environment. See Pennsylvania State Police v. Suders, 542 U.S. 129, 146-47, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). In Suders, the Supreme Court analyzed a claim that coworkers’ harassment and hostility subjected an employee to a constructive discharge. Id. It noted that for an “atmosphere of sexual harassment or hostility to be actionable” alone, “the offending behavior must ... alter the conditions of the victim’s employment and create an abusive working environment.” Id. (citations' and quotation marks omitted). Then, the Court added that a constructive discharge claim based on harassment “entails something more” than even a hostile-work environment claim: “working conditions so intolerable that a reasonable person would have felt compelled to resign.” Id.
Thus, if a jury could not find that Lee was subject to a hostile work environment, then it could not find that she suffered a constructive discharge, as the majority contends, based on harassment. See id. To be actionable as a hostile work environment claim, harassment must be “severe” and “pervasive.” Ault v. Oberlin Coll., 620 Fed.Appx. 395, 400 (6th Cir. 2015). To determine whether treatment qualifies as severe or pervasive, courts “look at all the circumstances including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.” Id. (citations and quotation marks omitted). As indicated by the terms “severe” or “pervasive,” this requires a plaintiff to show serious mistreatment. See, e.g., Williams v. CSX Transp. Co., 643 F.3d 502, 506 (6th Cir. 2011) (holding that a supervisor’s isolated comments, while “insensitive, ignorant, and bigoted,” did not create a hostile work environment); Armstrong v. Whirlpool Corp., 363 Fed.App’x 317, 327 (6th Cir.2010) (holding that even multiple incidents of “alleged serious racial discrimination” failed to “alter the conditions” of plaintiffs employment).
Here, Lee alleges that Meyer asked her about retirement twice and mentioned her father’s retirement—hardly “pervasive” or “severe” harassment. She alleges that a nurse named “Jamie Jameson” once made juvenile, offensive remarks that Lee reported and that younger nurses called her names which she appears to have never reported.[5] The alleged comments, while offensive, lack either the severity or pervasiveness necessary to constitute a hostile work environment. Moreover, the circumstances do not permit an inference that the Clinic permitted an “intolerable” environment with the intent to force Lee out. At best, the evidence would support a finding that the Clinic responded poorly to comments from “Jamie Jameson.” It could not sustain a finding that the Clinic constructively discharged Lee.
Ill
On her retaliation claims, Lee has advanced insufficient evidence to create a genuine dispute as to whether the Clinic disciplined Lee because of her discrimination complaints. Lee can point to three disciplinary actions after she complained about discrimination: (1) she was subject to a performance plan and received a corrective action; (2) she received a second corrective action; and (3) she received a sus *508 pension. For the first incident, the Clinic cites Lee’s abrasive treatment of patients and her inability to accept criticism. For the second, it points to her failure to monitor a patient with a serious condition. And for the third, it says it wanted to investigate whether she confronted a patient about her discipline.
To show pretext, Lee can show that the proffered reasons “(1) have no basis in fact, (2) did not actually motivate the defendant’s challenged conduct, or (3) [were] insufficient to warrant the challenged conduct.” Maben v. Southwestern Med. Clinic, 630 Fed.Appx. 438, 443 (6th Cir. 2015) (quoting Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000)). But a retaliation case is “not a vehicle for litigating the accuracy of the employer’s grounds” for discipline. Tingle v. Arbors at Hilliard, 692 F.3d 523, 530 (6th Cir. 2012). To show pretext, Lee must “offer some evidence that not only were the employer’s reasons false, but that retaliation was the real reason for the adverse action.” Id. An employer with an honest belief in its reason for discipline, even when ultimately mistaken, is entitled to summary judgment when its belief is based on particularized facts. Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 598-99 (6th Cir. 2007).
Here, Lee admits to misconduct justifying her discipline. Even when she says that the conduct is mischaracterized, she admits others perceived the incidents differently and reported them. With respect to her performance plan, Lee agrees that the incidents the Clinic cites happened. Lee did tell a patient that she should have taken care of her medicine herself and that Lee did not have the time. She also concedes that a fellow nurse reported this interaction to Meyer and described Lee as being “abrasive” and “pushy.” Further, she admits to a tense exchange with a patient’s family four days later in which they accused her of blaming her errors on a nursing student. After this, she admits to asking them to keep the error “discreet” and that a fellow employee tattled on her. Whether a jury might have believed her story that she actually acted prudently in each instance seems irrelevant. She confirms the statements the Clinic heard about, and the perception others had about these interactions. The Clinic had information that gave it legitimate concerns about her behavior.
That the Clinic issued this performance plan to Lee after her discrimination complaint to Meyer and the Clinic’s human resource department creates no genuine dispute here. Proximity means little when an employee levels the accusation in response to potential discipline. See, e.g., Beard v. AAA of Michigan, 593 Fed.Appx. 447, 451 (6th Cir. 2014) (“An employee cannot allege discrimination like a protective amulet when faced with the possibility that his preexisting disciplinary problems could lead to his termination”); Hervey v. County of Koochiching, 527 F.3d 711, 723 (8th Cir. 2008) (“Insubordinate employees may not insulate themselves from discipline by announcing an intention to claim discrimination just before the employer takes action.”). Lee undisputedly levelled her accusations after being asked by Meyer to discuss reports that she was pushy and abrasive with a patient. And this came after Meyer had already discussed Lee s behavior with her in November and warned that she might issue Lee a corrective action in the future.
Moreover, the thrust of the Clinic’s concerns—Lee’s interpersonal skills with patients and coworkers and inability to accept criticism—hardly seem like contrivances. In fact, the record shows a common theme running through every incident where Lee faced discipline. Lee even responded to the criticism in her perform- *509 anee plan by telling the Clinic that she “wasn’t appreciated for anything” and that management cared about things that patients “should not even be mad about.”
As to the second supposedly retaliatory act, the second corrective action, Lee likewise shows no evidence undercutting the Clinic’s honest belief in its reasons or showing them to be pretextual. Lee admits that she failed to alert a doctor to the aneurysm patient on time. Consistent with the criticism in her performance plan, Lee deflects blame to this day and shifts responsibility for the incident on to a secretary. The second corrective action was precipitated by undisputed facts and seems wholly warranted given the error’s gravity and Lee’s earlier placement on a performance plan.
The last allegedly retaliatory incident adds little for Lee’s case. She admits that she discussed her discipline with the patient. She concedes that she told the patient that she thought she might be terminated over the incident. Whether the patient initiated this contact with Lee or, as Lee claims, actually offered Lee moral support matters little. The Clinic had reports that Lee aired her grievances to the patient and suspended her to investigate whether she actually did. The Clinic un-disputedly had a basis to investigate this incident.
Finally, Lee’s comparator evidence affords little support for a finding that the Clinic’s stated concerns were merely a pretext for unlawful retaliation. As the district court found, Lee faced discipline similar to that imposed on her supposed comparators. See Lee v. The Cleveland Clinic Found., No. 1:15 CV 91, 2016 WL 29226, at *10 (N.D. Ohio Jan. 4, 2016). And no comparators presented the sort of persistent problems with their bedside manner or the insolence when confronted with their problems that Lee displayed. Giver her track record, it comes as no surprise, and seems entirely reasonably, that Lee’s discipline continued to escalate. I see no genuine dispute as to whether the Clinic meant to punish her for conclusory discrimination complaints.
IV
Although the majority aims to apply the summary-judgment standard evenhandedly, it ends up merely accepting that genuine disputes exist because Lee claims they do. As a result, Lee is permitted to invoke the federal judicial machinery to pursue her various workplace grievances based on pure speculation that her age, race, or any protected activity was a motivating factor. I dissent.

. Or perhaps the wife’s mother was receiving chemotherapy. It is unclear. But the point is the woman was vulnerable.

. When asked to confirm the accuracy of • Meyer's notes on this meeting, Lee did not dispute them.

. A.D.A.M. Medical Encyclopedia [Internet]. Atlanta (GA): A.D.A.M., Inc.; ©2016. Abdominal Aortic Aneurysm; reviewed 2015 Aug 13; page last updated 12/02/2016. Available from; https://medlineplus.gov/ency/article/000162. htm

. It requires no impermissible inferences, only common sense, to understand the import of any comment Meyer made about "never” returning to the campus in this context. Any troublemaker suspended from school is routinely subject to the same kind of restriction during their suspension.

. The Clinic says it could not find any employee by the name Jamie Jameson in its records.