In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-3661

DEBRA KAUFFMAN,

*Plaintiff-Appellant*,

*v.*

PETERSEN HEALTH CARE VII, LLC, doing business as MASON
POINT,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 2:12-cv-02079-MPM-DGB— **Michael P. McCuskey**, *Judge*.

ARGUED SEPTEMBER 18, 2014 — DECIDED OCTOBER 16, 2014

Before WOOD, *Chief Judge*, and POSNER and MANION, *Circuit Judges*.

POSNER, *Circuit Judge*. This is a suit under the Americans with Disabilities Act, which so far as pertains to this case forbids an employer to discriminate against "a qualified individual," 42 U.S.C. § 12112(a), defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that

such individual holds or desires." § 12111(8). The plaintiff
began working as one of two hairdressers (also doing mani-
cures) at Mason Point in 1981. Mason Point is a large nursing
home located in the countryside outside the town of Sulli-
van, in south-central Illinois. Mondays and Tuesdays the
plaintiff would wheel residents one by one in their wheel-
chairs from their rooms to the nursing home's beauty shop,
do their hair, then wheel them back to their rooms. On the
other days of her four-day workweek she mainly did the
hair of residents who could get to the beauty parlor under
their own steam and of residents confined to their rooms, so
on those days she rarely had to push wheelchairs. She had
some duties that were unrelated both to hairdressing and
wheelchairs, such as cleaning out the birdcages in the nurs-
ing home, helping out in the laundry, and carrying breakfast
trays to residents.

The focus of concern in this litigation is her wheeling du-
ties. The residents whom she wheeled ranged in weight
from 75 to 400 pounds; she estimated their average weight at
120 pounds. A lot of wheeling is involved, because as shown
in the aerial map below the nursing home consists of several
scattered buildings. Although the beauty parlor (BLD 3 in
the diagram) is centrally located, it is about 500 feet from the
farthest residential building (BLD 13). The plaintiff esti-
mated that it usually took her no more than two or two and
a half minutes to wheel a resident to the beauty parlor even
from that building. But probably it took longer. For she said
that on her journeys to and from the beauty parlor residents
would often stop to talk to her or her passenger. And some
of the corridors in the nursing home have ramps, which the
wheelchairs must traverse. The other hairdresser confirmed
the plaintiff's time estimate, but probably meant that two to

two and a half minutes was the average time to wheel a resident from the resident's room to the beauty parlor, rather than the time required for the farthest journey.



In late December 2010 the plaintiff had a hysterectomy because of what is called uterine prolapse cystocele (cystocele is also called prolapsed bladder): her uterus had slipped out of its normal position and in doing so had dislodged her bladder. As part of the operation to remove the uterus, the bladder was reconstructed and a mesh lining installed in her abdomen to hold the bladder in place.

Her doctor gave her written permission to return to work eight weeks after the operation, but with the notation that she could not "push over 20 pounds until released to do so," a limit raised by the doctor to 50 pounds five months later. But he didn't know that her job involved pushing wheelchairs; he thought her just a hairdresser. When later she

mentioned her wheelchair duties to him, he told her "you can't be pushing and lifting" people in wheelchairs, because "over a repetitive time" that would cause her mesh lining to be torn loose "and you'll be back in for bladder repair again." Although at the oral argument the plaintiff's lawyer told us that the weight restriction was later removed and that her client can now push wheelchairs again (though she is not doing so), these representations are belied by the plaintiff's testimony about her doctor's warning her not to push wheelchairs any more, at least occupied wheelchairs. Piling on the confusion, eventually the doctor informed her that the restrictions had been lifted, yet in the next sentence of the same letter (actually a letter addressed "to whom it may concern re: Debra Kauffman"—the intended recipient doubtless being her then employer, Mason Point, though she received a copy) warned that if she did heavy lifting (presumably including pushing a wheelchair with a person in it), she might again experience a prolapsed bladder. For what it's worth we note that most doctors recommend not lifting more than 50 pounds *ever* after the type of surgery she had. ReedGroup, "Disability Guidelines: Cystocele or Rectocele," www.mdguidelines.com/cystocele-or-rectocele (visited Sept. 25, 2014, as were the other websites cited in this opinion).

We don't understand the defendant to be denying that the consequences of the plaintiff's prolapsed bladder constituted a disability within the meaning of the Americans with Disabilities Act: "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A); see also § 12102(2). A prolapsed bladder impairs not only ability to lift and push but also vaginal and bladder functions. See ReedGroup, *supra*.

On the basis of the doctor's warning, the plaintiff advised the nursing home's administrator, Darin Wall, that she could not push residents in wheelchairs any more. She testified at her deposition that he responded that "we just don't allow people to work with restrictions, and you have a restriction on here … . [A]s long as you've got the restriction we can't employ you." She asked him whether someone else might push the residents to and from the beauty parlor for her, but he demurred. He testified at his deposition that "we were not able to accommodate that. It would put a hardship on the facility to hire somebody to transport the patients from the beauty shop to the resident's room and back and forth. That was something that we were not able to do."

After Wall made clear that he would not accommodate her disability, she quit. Until she was replaced, the remaining hairdresser received assistance from other staff in wheeling the residents to and from the beauty parlor. There is no suggestion that this diversion of staff from their normal duties was costly to the nursing home or impaired the care provided the residents.

In granting summary judgment in favor of the nursing home, the district judge ruled that wheeling patients to and from the beauty parlor is an essential part of the hairdressers' job and therefore there was no reasonable accommodation to the plaintiff's disability that would enable her to meet the employer's reasonable expectations. Unresolved factual disputes vitiate the judge's analysis. While Wall estimated that wheeling residents occupied 60 to 65 percent of the plaintiff's workday, she estimated that it occupied only 6 percent of her time on Mondays, when she would usually have only 4 to 6 residents whom she had to wheel, and 12

percent on Tuesdays, when she had 10 or 11 residents to wheel, and insignificant time the other two days of her work week. She worked a 35-hour week, but she front-loaded her hours so that she worked 9.5 hours on Mondays and on Tuesdays, or 19 hours for the two days. Nine percent ((6% + 12%) ÷ 2) of 19 hours is 1.71 hours. The question would then be whether her inability to wheel could reasonably be accommodated by assistance from other staff, as seems to have worked for the other hairdresser after the plaintiff left the nursing home until a replacement was hired.

Staff time at the nursing home is approximately 3 hours a day per resident. *The Nursing Home Site*, "Mason Point in Sullivan, Il.," www.nursinghomesite.com/mason_point_sull ivan_il#MASON_POINT_Staff_Size. As there are about 100 residents, 3 hours of staff time per resident equates to a total of 300 hours of staff time a day, or 600 on Monday plus Tuesday. Fewer than two hours of pushing wheelchairs for a hairdresser on Monday and Tuesday would thus require less than one-third of one percent (2 ÷ 600 = .0033) of the available staff time on those two days. One would think it possible without disrupting the operation of the nursing home to assign one member of the staff to push wheelchairs for the plaintiff on Mondays and another to do the same on Tuesdays. Of course this is on the assumption that the plaintiff's estimate of the time she spent wheeling wheelchairs (fewer than two hours a week) is at least approximately correct, and it may not be. But it is more realistic than administrator Wall's estimate, which has the plaintiff spending almost two-thirds of her entire workweek pushing wheelchairs back and forth. Wall was thus way off base in saying (what he was actually thinking when he was speaking is another matter) that continuing to employ her would have required hir-

ing an additional employee to wheel for her. (What is true, though mentioned by neither party, is that an orderly who wheeled for her would require a few minutes to walk to the resident's room to begin the wheeling and to walk to the beauty parlor to start wheeling the resident back to her room.)

What the best estimate of the plaintiff's time spent wheeling is can't be determined on a motion for summary judgment. A trial is required. The district judge thought the disparity in time estimates was not a real dispute because, however much or little time the plaintiff had spent before her operation in pushing wheelchairs, it was an essential part of her job. But it wasn't essential if it was so small a part that it could be reassigned to other employees at a negligible cost to the employer.

The district judge also thought the plaintiff's estimate of the time she had spent pushing wheelchairs "vague and inconclusive," yet he said nothing about the implausibility of Wall's estimate of how much time the plaintiff had devoted to that task. Again the judge was attempting to resolve a genuine factual dispute without a trial.

A further problem with the judge's handling of this case concerns a dispute over the nursing home's policy toward employees who have a disability. When the plaintiff showed Wall her doctor's note that forbade her to "push over 20 pounds until released to do so," neither she nor he knew she would never be "released" to resume her wheelchair-pushing duties. She says that Wall told her "we don't allow people with restrictions to work." That would be a violation of the Act. He testified at his deposition that he told her "with *permanent* restrictions." The judge accepted his testi-

mony, again apparently forgetting that resolving a testimo-
nial contradiction between depositions requires a trial.

More important, it's not true that the fact that a restric-
tion is permanent automatically excuses the employer from
making any attempt to accommodate it. Otherwise an ampu-
tee would never have a right to an accommodation, even if it
involved nothing more costly to the employer than lowering
the sink in the employees' bathroom. Indeed Wall's ac-
knowledgment that Mason Point will not retain an employee
who has a permanent restriction (a policy sometimes re-
ferred to as "100% healed") would if accepted as a defense
read "reasonable accommodation" out of the Americans
with Disabilities Act. *Powers v. USF Holland, Inc.*, 667 F.3d
815, 819 (7th Cir. 2011); *Henderson v. Ardco, Inc.*, 247 F.3d 645,
653 (6th Cir. 2001). "Job restructuring" is one of the accom-
modations that an employer must consider. See EEOC, *En-
forcement Guidance: Reasonable Accommodation and Undue
Hardship Under the Americans with Disabilities Act*: "Job Re-
structuring," www.eeoc.gov/policy/docs/accommodation.ht
ml#job. If a minor adjustment in the work duties of a couple
of other employees would have enabled the plaintiff despite
her disability to perform the essential duties of her job as a
hairdresser, the nursing home's refusal to consider making
such an adjustment was unlawful. We noted in *Majors v.
General Electric Co.*, 714 F.3d 527, 534 (7th Cir. 2013), citing
*Miller v. Illinois Dept. of Transportation*, 643 F.3d 190, 199–200
(7th Cir. 2011), that "circumstances might exist when em-
ployees working in teams are able to share duties among
themselves, so that such sharing might be a form of reason-
able accommodation." So minor an adjustment would be
"reasonable."

If an accommodation to an employee's disability is reasonable, the burden shifts to the employer to "demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business." 42 U.S.C. § 12112(b)(5)(A). Mason Point has made no such demonstration. Wall cited "hardship" only in reference to hiring a new employee whose only job would be to wheel residents whose hair was done by the plaintiff to the beauty shop and back. He did not mention the possibility of diverting some time of existing employees to that wheeling. There is no suggestion that the terms of a collective bargaining agreement (if there is one, of which there's no evidence), or anything else, would have made the slight adjustment (necessary to preserve the plaintiff's job) of the work routines of a few members of the nursing home's staff costly or impracticable. There is only Wall's assertion that he doesn't employ people with permanent work restrictions, regardless of the gravity of the restrictions or the feasibility and cost of accommodating them.

A further problem with the district judge's decision is his ignoring the requirement that when an employee asks for an accommodation because of a disability, "the employer must engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996); see also 29 C.F.R. § 1630.2(o)(3); *Basden v. Professional Transportation, Inc.*, 714 F.3d 1034, 1038–39 (7th Cir. 2013); *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112–16 (9th Cir. 2000) (en banc), vacated on other grounds, 535 U.S. 391 (2002). Wall didn't do that. He did tell the plaintiff that he'd check with his superiors about accommodating her and get back to her after he did—but when he did get back to her all

he said was that he couldn't accommodate her disability. This left her with no alternative to quitting. He should have asked her how much of her time at work is spent pushing wheelchairs, and on the basis of her answer and relevant information from other employees, such as the other hairdresser, have decided whether her disability could be accommodated without undue hardship to the nursing home. Had he discovered that only a few hours a week were involved, he would have known better than to tell her that he'd have to hire a new employee just to push wheelchairs for her.

And remember that she had other duties besides pushing wheelchairs and doing residents' hair. She raised the possibility of switching from hairdressing to full-time work in the laundry, but Wall brushed off the suggestion, so far as appears with no consideration of its feasibility. He did not indicate, by the way, that the nursing home has ever attempted to accommodate an employee (the staff numbers over 40, we were told at the oral argument) who has a disability.

And speaking of those 40 employees, we imagine that some of them are orderlies whose primary duty is wheeling the residents. For almost three-quarters of the residents are wheelchair-bound, and most of them surely don't want to spend all day in their room. And beauty parlor visits are only once a week. Should a trial reveal that the only accommodation needed to enable the plaintiff to remain employed by the nursing home would have been a couple of hours of orderly time a week, Wall might have a very hard time proving that such an accommodation would be a "hardship" to the nursing home.

The grant of summary judgment in favor of the defendant is reversed and the case remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

MANION, *Circuit Judge*, concurring.

I agree with the court that a question of fact exists concerning whether transporting residents to and from the beauty parlor is an essential job function for hairdressers working for Mason Point. Thus, I concur in the court's decision reversing the district court's grant of summary judgment to Mason Point and remanding the case for trial. I write separately, however, to stress that in determining whether a task constitutes an essential job function, the percentage of time spent on the task and the cost to the employer if the task is reassigned are not necessarily deciding factors. Further, an employer need not reassign an essential job function to another employee, although it must, of course, provide reasonable accommodations to allow a qualified individual with a disability to perform essential functions.

Under the ADA, an employer cannot discriminate against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To be a qualified individual with a disability within the meaning of the ADA, in addition to being disabled (as statutorily defined, and not at issue in this case) the individual must be able "with or without reasonable accommodations, [to] perform the essential functions of the employment position … ." 42 U.S.C. § 12111(8). At issue in this case is whether transporting wheelchair-bound residents to and from the hair salon at Mason Point is an essential function of the hairdresser position.

In determining whether a task is an essential job function, "a court may consider, but is not limited to, evidence of the employer's judgment of a position, written job descriptions

prepared before advertising or interviewing applicants for the job, the work experience of past incumbents of the job, and the work experience of current incumbents in similar jobs." *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001) (citing 29 C.F.R. § 1630.2(n)(3)). "The amount of time spent on the job performing the function" is also a factor used to determine whether a task is an essential function. *Id.* at 929 n.2 (quoting 29 C.F.R. § 1630.2(n)(3)(iii)).

In this case, there is a great disparity in the estimates concerning the amount of time Kauffman spent wheeling residents to and from the beauty salon. The court stresses this disparity, as well as the theoretical percentage of time another staff member would need to spend on that task. But the amount of time spent on a task is but one factor considered in determining whether a task is an essential job function. It is not dispositive because "an essential function need not encompass the majority of an employee's time, or even a significant quantity of time, to be essential." *Basith*, 241 F.3d at 929. Thus, even if Kauffman spent only 1.71 hours pushing wheelchairs, that task could nonetheless be an essential job function. *Id.* (holding that delivery of prescription medications was an essential function of a Pharmacy Technician II position, even though it took up "only 45 minutes to an hour of an 8-hour day").

The court hypothesizes that an orderly could easily take over the task and focuses on the potentially low cost of reassigning the transporting task to an orderly (or another staff member). But "[a]n employer need not reallocate the essential functions of a job, which a qualified individual must perform." *Basith*, 241 F.3d at 929 (quoting *Benson Northwest Airlines, Inc.*, 62 F.3d 1108, 1112–13 (8th Cir. 1995)). Further, "[t]he fact that

restructuring is feasible, in itself, is not persuasive evidence one way or the other that a function is essential to a job." *Basith*, 241 F.3d at 930.

Moreover, it may well be that Mason Point views the time the hairdresser spends with the resident during the trip to and from the beauty salon as even more essential than the physical conveyance of the patient from point A (her room) to point B (the salon). The weekly trip to the beauty salon might be a highlight for some of the wheelchair-bound residents, providing them an opportunity to visit with the hairdresser as well as to speak with others likewise limited in mobility. As Kauffman explained at her deposition, she was often stopped by other residents to chat and also at times pulled aside at the medical center so the staff could weigh the resident.

No doubt over time Kauffman became well acquainted with the residents that she serviced. A resident's mental capacity and physical needs will vary. Knowledge acquired by Kauffman over the years about such things as relatives, medical conditions, treating physicians, and other interests promotes conversations that are meaningful to the resident. Encouraging this type of relationship not only benefits the resident, but also could be a source of information for Mason Point. If a resident experiences some mistreatment or neglect, or if a resident has a personal problem that she would like to quietly share, discussions during the trip to and from the salon become an important part of the quality treatment and service Mason Point would encourage. After all, Kauffman had worked there for twenty years, and surely she often developed this kind of friendship. That quality service may be essential because it benefitted the resident and Mason Point.

An orderly could obviously transport the residence just as easily, but in addition to all of the other personal benefits mentioned, Mason Point could also reasonably conclude that it made more sense for the hairdresser to transport the resident because then any delays in the transport would not affect anyone else: There would not be another resident waiting to be picked up at the hair salon, or a hairdresser waiting for the next resident to arrive. That, in essence, is what Mason Point argues:

> It does not enhance the quality of life for these Residents to be seated in a wheelchair (which may or may not be a comfortable position) and lined up at Mason Point's salon. It is better for the Resident to be brought down only when ready to be served and the beautician is the only person capable of determining when she is ready to help the next Resident.

An employer is free to determine job responsibilities of its employees, and "it is not this court's duty to second-guess that judgment so long as the employer's reasons are not pretextual." *Id.* at 929.

I also have concerns with the court's focus on Mason Point's temporary reassignment of the transportation function to others while it was short a hairdresser. At most this shows that reassignment was feasible. More significant, though, is the fact that when a new hairdresser was hired, the hairdressers resumed the transport function. Among other things, courts should consider how, in practice, past and present employees perform the job. Kauffman, her replacement, and the other hairdresser (Nancy Burich) were all responsible for transporting residents to and from their appointments.

On remand, the trier of fact will need to evaluate the totality of facts to determine whether transporting residents was an essential job function. But even if it is an essential function, Kauffman may be able to show on remand that a reasonable accommodation would allow her to transport residents to and from the salon. The court illustrates as an accommodation lowering the level of a bathroom sink to allow an amputee to perform the essential functions of a job. The court, though, indicates that reassigning the transporting function is an equivalent accommodation. However, as noted above, an employer need not reassign an essential job function. *See supra* at 13-14. Perhaps more analogous to the sink situation, though, is the possibility of providing a battery-operated attendant-controlled wheelchair which would allow someone with Kauffman's condition to safely operate it and traverse the short trip each way without any extra exertion that would violate the physician's limitations. Of course this might be an added expense. But it would meet Mason Point's goal in rendering high-quality service to the resident and allow Kauffman to continue those important relationships that she has developed over the years. A random pushing assignment from the orderly pool would be a poor substitute for the resident's special relationship with the hairdresser. Accordingly, if transporting residents is an essential job function, the court on remand will then also need to consider whether such an accommodation is reasonable.

I concur.