NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0527n.06

No. 14-3967

<table>
<tr><td>UNITED STATES COURT OF APPEALS<br>FOR THE SIXTH CIRCUIT</td><td>)</td><td rowspan="2"><strong>FILED</strong><br>Jul 24, 2015<br>DEBORAH S. HUNT, Clerk</td></tr>
</table>

| | | |
|---|---|---|
| SHARON AULT; KATHY FENDERSON; CAROL REINHARD, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| OBERLIN COLLEGE; BON APPETIT | ) | NORTHERN DISTRICT OF |
| MANAGEMENT COMPANY; DEAN HOLLIDAY; | ) | OHIO |
| MARVIN KRISLOV, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE:    DAUGHTREY, GIBBONS, and GRIFFIN, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge.  The three plaintiff-appellants—Sharon Ault, Kathy Fenderson, and Carol Altenburger[1]—were employees of Oberlin College and worked in the school's Dining Services Department.  Bon Appetit Management Company, a catering contractor, was responsible for operating Oberlin's dining facilities.  The plaintiffs allege that they were subjected to various acts of sexual harassment at the hands of Dean Holliday.  They brought various claims against Oberlin, Bon Appetit, and Holliday, including a claim for hostile work environment sexual harassment under Ohio's Chapter 4112.[2]  The district court granted summary judgment in defendants' favor on all claims.

---

[1] Altenburger was previously known as Carol Reinhard.

[2] The plaintiffs also brought claims against Marvin Krislov, the President of Oberlin College.  The plaintiffs later voluntarily dismissed with prejudice all claims against Krislov.

We affirm the district court's grant of summary judgment in favor of Holliday and Bon Appetit as to all claims against them. We also affirm the grant of summary judgment in Oberlin's favor on all of the claims that Ault and Altenburger brought against Oberlin and on all of Fenderson's claims against Oberlin except for her hostile work environment claim. As to that single claim only—Fenderson's Chapter 4112 action against Oberlin—we reverse the district court's grant of summary judgment in Oberlin's favor and remand for further proceedings consistent with this opinion.

## I.

The three plaintiff-appellants—Sharon Ault, Kathy Fenderson, and Carol Altenburger— were employees of Oberlin College in Ohio and worked in its Dining Services Department.[3] Their employment was governed by a collective bargaining agreement between Oberlin and Local 2192 of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America.

Since 2001, a private contractor, Bon Appetit Management Company, has operated Oberlin's dining facilities. Bon Appetit provides a management team to "oversee" the dining operations. The managers "monitor[] the production and quality of work of the Oberlin College food service employees," and "coach" those employees in their performance. But Bon Appetit and its employees have "no authority to hire or fire Oberlin College employees; modify or transfer their work assignments; affect their rates of pay; or otherwise affect the terms and conditions of their employment." Bon Appetit also lacks "authority to discipline an Oberlin College employee for unsatisfactory performance or misconduct." Bon Appetit employees are supervised by the company's General Manager and District Manager. "However, Oberlin has

---

[3] A fourth plaintiff, Enola Bowen, died after this appeal was filed. No motion was made to substitute Bowen's personal representative within the ninety-day limit. Fed R. Civ. P. 25(a)(1); Fed. R. App. P. 43(a)(1). Bowen's action is therefore dismissed.

the ultimate authority to ask Bon Appetit to hire or remove one of its employees from Oberlin's campus."

Dean Holliday was Bon Appetit's executive chef at Oberlin from September 2008 to September 2011. According to the plaintiffs' reports, Holliday sexually harassed them. Altenburger alleged six instances of harassment. First, when Altenburger asked whether there were any melon balls, Holliday asked her if she wanted to "ride [another employee's] balls." Second, he said to another employee—who later relayed the conversation to Altenburger—that the employee's children would have red hair "[o]nly if I fuck you." Third, hearing Altenburger ask whether she could look at the calendar in another employee's office, Holliday responded, "Oh, come into my . . . office. My calendar is much bigger." Fourth, Holliday told Altenburger that another employee looked nice "because I dress her." Fifth, he asked Altenburger if she was "going down" in the elevator, allegedly in a sexual manner. Sixth, she witnessed Holliday ask Ault, when Ault bent to reach something, to "bend over and . . . pick that up again." Altenburger testified that there were no other instances in which she found Holliday offensive "because I avoided him."

Ault made three allegations about Holliday's conduct. First, he referred to another employee's body, saying to Ault, "Oh, believe me, I've seen it. She's skinny." Second, Ault recounted the same comment that Altenburger had witnessed, in which Holliday asked Ault to bend over again. Third, looking at Ault's backside, Holliday remarked, "it looks pretty good back there." The only other incidents Ault described involved Holliday being "touchy-feely," on a consensual basis, with other people at work.

Fenderson made a single allegation. In June 2010, Holliday entered a walk-in cooler and saw Fenderson placing items on a high shelf. She testified in her deposition:

[A]ll of a sudden, Dean [Holliday] came up from behind me . . . and got behind me and put his pelvic area – his penis up against my butt and put his chin and shoulder right here (indicating) where I could feel him breathing. And I couldn't go forward because the rack was right there.

And I said, What are you doing? And I asked him – I said, Back up off me. What are you doing?

And he kept standing there, and I couldn't go sideways or no other way, and my hand was still on the shelf. And I said, Back up off me. Get off me. What are you doing.

And he just stood there with his chin right here on my shoulder – my right shoulder here (indicating) and you could feel his breath on me and his penis was on me. And I was trying to move forward, but I couldn't move forward, or I couldn't move backwards or sideways because I was trapped in there. And I was saying, Get up off me, back up off me.

And at this time Enola and Pat pulled the door off me, and he still didn't move then. And then he paused and then he backed up off me and walked away with his little smirk.

Oberlin's policy required employees to report sexual harassment to Camille Hamlin Allen, the College's Special Assistant for Equity Concerns. The policy, contained in a Business Conduct Policy Manual that each employee received, required harassment to be reported no later than one year after the last incident.

The plaintiffs first informed Oberlin about the alleged harassment in April 2011. But instead of alerting Allen, they contacted Yeworkwha Belachew, Oberlin's Ombudsperson. They did so because Belachew had spoken "at the beginning of all the meetings that we had at the college before we would go back to work . . . [and] would always say . . . in front of us, 'If you have a problem, come see me.'" The plaintiffs met with Belachew on at least two occasions. The plaintiffs allege that Belachew said to them at the final meeting: "We don't want a witch hunt here, do we? And you must be very concerned about your jobs, aren't you?" Oberlin denies that Belachew ever said this. When Belachew arranged for the plaintiffs to meet Allen,

they canceled that meeting. They did not discuss their complaints any further with anyone at Oberlin.

On September 20, 2011, Oberlin's President's Office received a letter containing the specific allegations against Holliday. The next day, Oberlin's human resources department advised Michele Gross, the College's Director of Dining and Business Operations, of the complaints. Gross immediately, on September 21, informed Bon Appetit's General Manager "and asked that Bon Appetit remove Holliday from campus." Bon Appetit complied.

Oberlin then commenced an internal investigation. In late November 2011, Bon Appetit received word "that [Oberlin] could not substantiate the claims" of Fenderson, Ault, or Altenburger. As a result, "Oberlin invited Dean Holliday to return to Oberlin's campus, but he declined the opportunity."

In March 2013, Fenderson filed a grievance with Oberlin. She alleged that since the opening of a new dining hall earlier in the year, she "has been on the catering rotation and has repeatedly been set up for failure by management by not having all the catering information . . . which is creating a very hostile work environment and making it extremely difficult to provide excellent service" on numerous occasions. She claimed that she was "obviously being singled out by management and being penalized for the mistakes of the catering [department]." Oberlin responded that the allegations in the grievance were unfounded. The union and the College settled the grievance in August 2013.

Altenburger and Fenderson continued to work at Oberlin. Ault retired in May 2013, following a period of medical leave. She claims that she retired because, after making the complaints against Holliday, she "did not want to suffer at the hands of [Holliday's] followers."

In December 2012, the plaintiffs filed suit in state court against Oberlin, the College's President, Bon Appetit, and Holliday. Oberlin, with the consent of other necessary parties, removed the case to federal court.

The plaintiffs' amended complaint, filed in August 2013, contained claims for: (1) sexual harassment in violation of Ohio's "Chapter 4112," Ohio Rev. Code §§ 4112 *et seq.*;[4] (2) breach of contract; (3) negligent hiring, supervision, and retention; (4) retaliation; and (5) "severe emotional distress." The plaintiffs sought unspecified compensatory and punitive damages.

The defendants filed separate motions for summary judgment. The district court granted summary judgment in favor of all defendants on all claims. The plaintiffs filed a timely notice of appeal.

## II.

We review a district court's grant of summary judgment *de novo*. *Keith v. Cnty. of Oakland,* 703 F.3d 918, 923 (6th Cir. 2013). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the court construes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.

Each plaintiff asserts a claim of hostile work environment sexual harassment under Chapter 4112 of the Ohio Revised Code. To prevail on such a claim against an employer, a plaintiff must demonstrate:

---

[4] The amended complaint also cited Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as a basis for the sexual harassment claim, but the Title VII claim was later dropped.

> (1) that the harassment was unwelcome; (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment, and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action.

*Ohio Civil Rights Comm'n v. Akron Metro. Hous. Auth.*, 892 N.E.2d 415, 419 (Ohio 2008) (quoting *Hampel v. Food Ingredients Specialities, Inc.*, 729 N.E.2d 726, 732–33 (Ohio 2000)) (internal quotation marks omitted). Even if the plaintiff satisfies these elements, the employer has an affirmative defense if (1) "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Starner v. Guardian Indus.*, 758 N.E.2d 270, 283 (Ohio Ct. App. 2001). In addition to the employer's potential liability, "a supervisor/manager may be held jointly and/or severally liable with his/her employer for discriminatory conduct of the supervisor/manager in violation of . . . Chapter 4112." *Genaro v. Cent. Transp., Inc.*, 703 N.E.2d 782, 787–88 (Ohio 1999). In Chapter 4112 cases, Ohio courts generally look to federal case law interpreting Title VII in addition to the state courts' own precedents. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981).

None of the defendants contest that the harassment was unwelcome and based on sex. The third element—whether the conduct was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment—is the crux of the dispute. We agree with the district court that Holliday's behavior toward Altnburger and Ault was not sufficiently severe or pervasive as a matter of law. With regard to Fenderson, however, we hold that there is a genuine issue of material fact on this issue.

A.

As stated, the harassing conduct must be "sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." *Akron Metro. Hous. Auth.*, 892 N.E.2d at 419 (internal quotation marks omitted). The Supreme Court of Ohio has alternatively stated this criterion as a requirement that "the harassment was sufficiently severe or pervasive as to create a hostile or abusive work environment." *Cincinnati Bar Ass'n v. Young*, 731 N.E.2d 631, 640 (Ohio 2000). That court has explained:

> [T]he conduct in question must be evaluated under both an objective and a subjective standard. That is, the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively perceive the environment as hostile or abusive.

*Id.* at 640. This creates a standard that is "sufficiently demanding to ensure that," like Title VII, Chapter 4112 "does not become a 'general civility code.'" *See Harter v. Chillicothe Long-Term Care, Inc.*, No. 11CA3277, 2012 WL 1997821, at *5 (Ohio Ct. App. May 29, 2012) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "[C]onduct must be extreme" to meet the standard. *Faragher*, 524 U.S. at 788. That said, the standard is not so high as to require that the victim suffer a tangible psychological injury. *See Burnett v. Tyco Corp.*, 203 F.3d 980, 982 (6th Cir. 2000) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

"Whether conduct is severe or pervasive is 'quintessentially a question of fact.'" *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006) (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)). To determine whether the conduct is sufficiently severe or pervasive to survive summary judgment, courts look at "'all the circumstances,'" including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance.'" *Hampel*, 729 N.E.2d at 735 (Ohio 2000) (quoting *Harris* 510 U.S. at 23). It follows that "simple teasing [and] offhand comments . . . will not amount to discriminatory changes in the terms or conditions of employment," and that the statute does not provide an action for "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788 (citations and internal quotation marks omitted). Isolated incidents may constitute discriminatory changes only if "extremely serious." *Id.*

Applying these principles, the conduct of which Altenburger and Ault complained, though vulgar and unprofessional, was not sufficiently severe or pervasive to sustain a Chapter 4112 claim. Neither plaintiff alleged that the incidents were physical in nature or that they perceived a threat of physical contact. The comments were relatively infrequent. There is some suggestion that the work environment became hostile from the two plaintiffs' subjective points of view. For example, Ault explained, "I was trying [to] avoid the elevator and take the stairs as often as possible so I didn't run into [Holliday]." Altenburger testified that she tried "not to be around Mr. Holliday at any time." But even if this created a genuine issue of material fact on the plaintiffs' subjective perceptions of the conduct as severe or pervasive, precedent indicates that the behavior was not sufficiently severe or pervasive—as a matter of law—from an objective point of view. The statute does not protect against a small number of "mere offensive utterance[s]." *See Harris*, 510 U.S. at 21; *Hampel*, 729 N.E.2d at 735. As the district court correctly observed, Ohio courts and this court have held that more serious or persistent conduct does not satisfy the hostile-work-environment element on summary judgment. *See, e.g.*, *Burnett*, 203 F.3d 980 (affirming summary judgment in favor of the employer where the supervisor made two suggestive comments and also committed a potential battery against her); *Black v. Zaring*

*Homes, Inc.*, 104 F.3d 822 (6th Cir. 1997) (reversing a jury verdict in favor of an employee who endured regular inappropriate sex-based comments during the four months she worked for the employer); *Brandner v. Innovex, Inc.*, 970 N.E.2d 1067 (Ohio Ct. App. 2012) (affirming summary judgment in favor of employer when supervisor allegedly touched the employee on four or five separate occasions and also made various comments about the employee's appearance and dress).

The plaintiffs argue that the court should consider a broader range of incidents than those discussed so far. They contend that Holliday was merely the ringleader and that the district court should have also considered other employees' harassing conduct. But the plaintiffs do not provide any details—let alone any evidence—of the sexually harassing conduct to which they allude or the individuals responsible. Ault also claims that the changed work environment led her to leave her employment. She took medical leave in November 2012. Rather than return to work, she decided to retire in March 2013 because, according to her deposition testimony, she "did not want to suffer at the hands of [Holliday's] followers." Asked to clarify, she explained: "[H]e had certain people that either he hired or . . . that enjoyed his touchy-feely sessions, and these are the same women who are wicked. You have no idea how badly you can be treated in there. It can be so bad that you . . . don't want to go to work. You're in tears on the way there." She further stated that the women in question had bullied her for unrelated reasons in 1997 and that, though they did not say anything to her about Holliday's removal from campus, she assumed they would make her work life difficult as a result. This testimony does not support Ault's sexual harassment claim because, even if the other employees' bullying was sufficiently severe or pervasive, there is no evidence that it was based on sex. Thus, there is no genuine issue of material fact as to whether Holliday's behavior toward Altenburger and Ault was severe or

pervasive. The district court correctly granted summary judgment in the defendants' favor on those plaintiffs' sexual harassment claims.

There is, however, a genuine issue of material fact as to whether Holliday's behavior toward Fenderson was severe enough to make Fenderson's work conditions hostile. In June 2010, Holliday entered a walk-in cooler and saw Fenderson placing items on a high shelf. She testified in her deposition that Holliday stood directly against her so that she could feel his penis, trapping her in position and remaining there despite Fenderson's telling him to remove himself.

Enola Bowen saw Holliday "up behind [Fenderson], on her backside." Bowen testified:

> And I got a little verbally violent . . .
>
> I asked him what the F he was doing. . . .
>
> He really didn't say anything. He looked at me like I was a piece of something that a dog would leave on the ground, which made me take offense. I was shocked of a manager doing something like that to an employee.

Another colleague, Pat McDowell, was also present. Bowen testified that McDowell "was angry and she was pounding on the table."

Fenderson does not allege any other incidents based on her sex. And the Supreme Court has explained in the Title VII context that "a hostile work environment claim cannot be said to occur on any particular day . . . [because] the actionable wrong is the environment, not the individual acts that, taken together, create the environment." *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 638 (2007), *superseded by statute on other grounds*, Lily Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5 (internal quotation marks omitted). But viewed in the light most favorable to Fenderson, this single act was egregious enough to create a hostile work environment.

Holliday's conduct was physically humiliating and perhaps even physically threatening. *See Hampel*, 729 N.E.2d at 735 (listing physical humiliation and physical threats among the criteria to consider in determining the severity and pervasiveness of the conduct). A reasonable jury could find that it was so severe that it subjectively created a hostile environment for Fenderson. She testified that it "freaked me out," and that "after that I didn't want to deal with it anymore because I thought it was wrong for him to do that to me. . . . It's very degrading." After that, she "tried to avoid him at all costs possible."

A reasonable jury could also find that this incident would have created a hostile environment from an objective viewpoint. We have previously found that a supervisor's conduct was severe and pervasive for Title VII purposes when it was "not merely crude, offensive, and humiliating, but also contained an element of physical invasion." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999). In that case, the supervisor put his arm around the employee's neck and placed his face against hers while speaking in sexual innuendo. *Id.*

Although *Williams* also involved other harassing conduct besides the physical invasion, we have previously held that a single act may give rise to a hostile work environment. In *Hickman v. Laskodi*, 45 F. App'x 451, 456 (6th Cir. 2002), we held that a claim survived a motion to dismiss although premised on just one alleged instance of harassment. Indeed, the harassment in that case—a verbal threat with no physical component—was less serious than the conduct at issue in the present case. We explained in *Hickman*: "An isolated incident of harassment, if 'extremely serious,' is sufficient to create a hostile work environment." *Id.* at 454. Other circuits have reached the same conclusion. *See, e.g., Howley v. Town of Stratford*, 217 F.3d 141, 153–54 (2d Cir. 2000); *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1072 (10th Cir. 1998).

In our view, these cases all rest on a sound reading of precedent. "'[S]evere or pervasive' is properly considered in the disjunctive." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009). This principle flows directly from Supreme Court precedent: "[I]solated incidents (*unless extremely serious*), will not amount to discriminatory changes in the terms or conditions of employment." *Faragher*, 524 U.S. at 788 (emphasis added) (internal quotation marks omitted). It follows, then, that extremely serious isolated incidents suffice. This notion fits with the general scheme that runs throughout Title VII and Chapter 4112 cases: though the frequency of the conduct is a relevant factor, it is not dispositive. Courts consider factors including the severity of the conduct and, relatedly, "whether it is physically threatening or humiliating, or a mere offensive utterance." *Harris*, 510 U.S. at 23. Relief may be available where the conduct is severe *or* pervasive; it need not be both. *See Faragher*, 524 U.S. at 786.

A remark in this court's opinion in *Burnett* may seem on its face to endorse a contrary approach. There we concluded that "a single battery [even when] coupled with two merely offensive remarks over a six-month period does not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create . . . a hostile work environment." 203 F.3d at 985. But in light of the precedents just discussed here, the only fair reading of the statement in *Burnett* is that it was a fact-specific determination. The court was not seeking to set a required number of incidents but rather to hold that the specific incidents at issue in the case were not sufficiently severe or pervasive.

Here, a reasonable jury could find that Holliday's alleged assault on Fenderson was sufficiently severe by itself that it created a hostile work environment. Several aspects make the incident especially severe. First, Fenderson could feel his penis as he pressed against her.

Second, he positioned himself in a way that prevented her from moving to escape the invasion. Third, he failed to relent, despite repeated requests.

These factors also distinguish Holliday's behavior from the supervisors' conduct in other cases cited by the defendants and the district court. For instance, we affirmed the grant of summary judgment in the defendant's favor in *Bowman v. Shawnee State Univ.*, 220 F.3d 456 (6th Cir. 2000). There, three incidents involved physical invasions: first, the supervisor rubbed the employee's shoulder for "approximately one to two seconds"; second, the supervisor "put her finger on [the employee's] chest, placed her hands upon him, and pushed him toward the door," at which time he left the office; third, at a party, the supervisor "grabbed [the employee's] buttocks." *Id.* at 458–59. Though highly inappropriate, these incidents do not rise to the level— individually or collectively—of Holliday's conduct in this case. At no point was the physical invasion in *Bowman* sustained or physically restraining, and the victim's bodily integrity was not violated to the same extent as it was when Fenderson felt Holliday's penis pressing against her. For the same reasons, the district court's reliance on *Moorer v. Summit County Department of Jobs and Family Services*, No. 5:10-CV-457, 2011 WL 2746098 (N.D. Ohio July 14, 2011), is unavailing. The physical contact in that case was a single incident in which the supervisor slapped the employer's backside. *Id.* at *4, *8.

In *Burnett v. Tyco Corp.*, the court described the single physical invasion as follows:

> [The supervisor] placed a pack of cigarettes containing a lighter inside [the employee's] tank top and brassiere strap[,] . . . pull[ing] the strap up just enough to insert the cigarette pack [so that] the resulting exposure was no greater than it would have been had [the employee] merely leaned over while wearing the tank top.

203 F.3d at 981. Again, although this incident was offensive and improper in any workplace, it does not equate to the severity of the present case. The brief incident in *Burnett* may have been

humiliating but it was not threatening. The victim was neither restrained nor subjected to the kind of invasion that Fenderson suffered. The same distinctions are present in *Clark v. United Parcel Service, Inc.*, 400 F.3d 341 (6th Cir. 2005), where the court held that the conduct with regard to one employee was not sufficiently severe or pervasive despite its physical nature. *Id.* at 352. But the contact consisted of the supervisor placing his vibrating pager against the employee's thigh as she walked by, *id.* at 345, which falls short of the alleged act in the present case. The physical invasion was also far less severe in *Stacy v. Shoney's, Inc.*, 142 F.3d 436, 1998 WL 165139, at \*1 (6th Cir. Mar. 31, 1998) (unpublished table disposition), in which the supervisor allegedly "inappropriately touched [the employee's] breast when he removed and replaced an ink pen from her front shirt pocket and said, 'That's a nice pen.'" *Id.*

According to the defendants, the allegations in *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48 (6th Cir. 1996), were "far more egregious than Fenderson's." In that case, we affirmed the grant of summary judgment in the employer's favor. 81 F.3d at 51. The allegations may have been more egregious: one defendant "exposed his genitals to plaintiff, threatened to force plaintiff to engage in oral sex with him, and 'stuck a ruler up [p]laintiff's buttocks' against plaintiff's will." *Fleenor*, 81 F.3d at 49. But we did not rely on, nor even consider, the requirement that the conduct be severe and pervasive enough to create a hostile work environment. Instead the court affirmed on the basis that the plaintiff could not show the existence of *respondeat superior* liability. *Id.* at 49–50. *Fleenor* neither binds nor guides us for present purposes.

This court erroneously relied on *Fleenor* in another case the defendants cite here: *Gwen v. Regional Transit Authority*, 7 F. App'x 496, 501 (6th Cir. 2001). There, the plaintiff's co-worker exposed himself to her "and approached her while making 'rude and inappropriate comments.'" *Id.* at 498. In ruling against the plaintiff, this court claimed: "[I]n *Fleenor* . . . we

affirmed the district court's finding of no hostile environment . . . ." As discussed, this is inaccurate. *Gwen* is therefore unpersuasive as well as non-binding.[5]

In sum, despite the cases holding various physical invasions to be insufficient as a matter of law to create a hostile work environment, the cases are all distinguishable because of the severity of the conduct at issue in this case.

The defendants claim that another hurdle remains for Fenderson. In *Armaly v. City of Wapakoneta*, No. 2-05-45, 2006 WL 1976191, at *8 (Ohio Ct. App. July 17, 2006), the Ohio Court of Appeals held that a plaintiff failed to satisfy her burden under Chapter 4112, in part because the supervisor's actions "were not interfering with her ability to do her job" or in any way affecting her job performance. The district court in the present case read the *Armaly* holding as requiring some affirmative showing of interference with the employee's ability to do her job as part of the hostile-work-environment prong.

We do not read *Armaly* in the same way. The Ohio Court of Appeals was interpreting the general standard: "'The employee must show that the abuse was either severe enough or pervasive enough to show that a condition of her work environment had been affected.'" *Id.* (quoting *Payton v. Receivables Outsourcing, Inc.*, 840 N.E.2d 236, 242 (Ohio Ct. App. 2005)). When the *Armaly* court then went on to hold that the plaintiff had not demonstrated an impact on her work, it was not seeking to require an affirmative showing that the plaintiff's actual work *output* suffered as a result of the harassment. A showing of a reduced work output may be sufficient in some cases to show a change in working conditions, but such a showing is not necessary. *See Akron Metro. Hous. Auth.*, 892 N.E.2d at 419 (stating the requirement that the

---

[5] Even if *Gwen* were published, the hostile-environment determination was arguably not part of the court's holding in that case. The court discussed the district court's decision on that prong and seemingly agreed with it but decided the case on the basis that the employer "took prompt remedial action," thus satisfying its burden under the fourth prong of the test. 7 F. App'x at 501–02.

behavior be "sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment," without requiring any showing of a diminution in output). A better reading is that the *Armaly* court did not find that there was a genuine issue of material fact on this issue because there was no evidence that the plaintiff's *experience* in the workplace had been negatively affected. In the present case, by contrast, there was evidence that Fenderson felt degraded, was left in shock, and therefore attempted to avoid Holliday. There is a genuine issue of material fact on the question whether the terms, conditions, or privileges of the work environment changed for Fenderson—both from her own perspective and objectively—as a result of Holliday's actions.

Although Altenburger and Ault fail to satisfy this third element of the test for Chapter 4112 liability, we hold that Fenderson's claim should survive summary judgment on this issue. We next proceed to consider whether Fenderson's claim satisfies the other essential elements.

B.

One of those elements concerns Fenderson's claim in the district court that Holliday was her supervisor. This question is relevant in two respects. First, Holliday may individually be jointly and/or severally liable only if he was a supervisor. Ohio Rev. Code § 4112.01(A)(2); *Genaro*, 703 N.E.2d at 787–88 (interpreting § 4112.01(A)(2) to provide that "individual supervisors and managers are accountable for their own discriminatory conduct" and they may therefore "be held jointly and/or severally liable with [their] employer[s]"); *Hale v. City of Dayton*, No. 18800, 2002 WL 191588, at *2 (Ohio Ct. App. Feb. 8, 2002) (holding that a co-worker, as distinct from a supervisor or manager, cannot be liable under Chapter 4112). Second, if Holliday was a supervisor, this establishes the fourth element of the test for imposing Chapter 4112 liability on Oberlin and/or Bon Appetit. *See Akron Metro. Hous. Auth.*, 892 N.E.2d at 419 (requiring the plaintiff to show "that either (a) the harassment was committed by a supervisor, or

(b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action").

The district court held that Holliday was not the plaintiffs' supervisor and the plaintiff-appellants do not provide any arguments on this issue on appeal. They have therefore abandoned this claim on appeal. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997); *see also Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008) (noting that the court has exercised its discretion to hear waived arguments only in "exceptional cases or particular circumstances or when the rule would produce a plain miscarriage of justice" (internal quotation marks omitted)). We see no reason to reach the merits of the issue here.

As a result, Holliday cannot be personally liable to Fenderson.

C.

Given the plaintiffs' failure to argue on appeal that Holliday was their supervisor, Oberlin can be liable to Fenderson under Chapter 4112 only if it "knew or should have known of the harassment and failed to take immediate and appropriate corrective action." *Hampel*, 729 N.E.2d at 732–33.

Fenderson first reported the allegations against Holliday to an Oberlin representative in April 2011. Yet Oberlin did not contact Bon Appetit to request Holliday's removal from campus until September 2011. These facts alone appear to create a genuine issue of fact as to whether Oberlin's corrective action was timely and appropriate.

Oberlin could not have taken action to prevent Holliday from committing the battery against Fenderson because neither Fenderson nor any other employee reported the incident until over nine months after it took place. But the harm in a hostile work environment claim is not the harassment itself but the hostile environment that it creates. *See, e.g.*, *Nat'l R.R. Passenger*

*Corp. v. Morgan*, 536 U.S. 101, 116–21 (2002) (discussing the nature of hostile environment claims as distinct from claims premised on specific discrete acts). Thus, Oberlin could potentially be liable for the hostile work environment that existed from the time it should have taken corrective action to the time Holliday was removed. The question is therefore whether Oberlin took appropriate action when it received the report.

The undisputed facts about Oberlin's handling of the report are as follows. Fenderson reported the incident to Belachew, with whom the plaintiffs-appellants met at least twice. Belachew arranged for the plaintiffs to meet with Allen but the plaintiffs canceled that meeting, electing instead to retain a lawyer. The significance of the plaintiffs' cancelation of the meeting is discussed below. For present purposes, however, the issue is whether Oberlin's handling of the incident was appropriate. Soon after the plaintiffs notified her, Belachew emailed Allen and Eric Estes, the Associate Dean of Academic Diversity, providing general information about the reports. There is no evidence that Oberlin took any further steps until the plaintiffs' lawyer wrote to Oberlin in September 2011. A reasonable jury could find that Oberlin did not take timely or appropriate action.

## D.

Our analysis thus far has demonstrated that a reasonable jury, viewing the facts in the light most favorable to Fenderson, could find that she made out the *prima facie* elements of a Chapter 4112 claim against Oberlin. Nevertheless, Oberlin is entitled to an affirmative defense if it can demonstrate (1) that "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," *and* (2) that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Starner*, 758 N.E.2d at 283. "Generally, an employer satisfies the

first part of this two-part standard when it has promulgated and enforced a sexual harassment policy." *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 456 (6th Cir. 2008) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher*, 524 U.S. at 807). The need for enforcement of the policy means that "it is not enough for an employer merely to have a sexual harassment policy; the acts of an employer must be evaluated to determine whether the employer acted reasonably." *Starner*, 758 N.E.2d at 283 (citing *Brentlinger v. Highlights for Children*, 753 N.E.2d 937 (Ohio Ct. App. 2001)). Under the second element, "while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden." *Ellerth*, 524 U.S. at 765.

There is no dispute that Oberlin had a sexual harassment reporting policy. Fenderson and the other plaintiffs did not follow that policy to the letter, contacting Belachew rather than Allen and then canceling the scheduled meeting with Allen. Oberlin therefore argues that it satisfied the first prong of the affirmative defense by exercising reasonable care as an employer. It promulgated a policy to facilitate the reporting of harassment and discrimination. It then took several additional steps even though Fenderson and the other plaintiffs did not follow the policy. Belachew met with the plaintiffs, set up a meeting with Allen, and emailed Allen and Estes to provide the general details of the complaints. But despite being on notice, Oberlin did not contact Bon Appetit or take any other action until it heard from the plaintiffs' lawyer. A reasonable jury could find that this did not meet the reasonable care standard. We therefore conclude that Oberlin is not entitled to summary judgment on this issue.

Even if Oberlin could prevail on this first element at this stage, it cannot prevail on the second element. Although the plaintiffs did not follow all of the reporting steps set out in the policy, their failure to act is not dispositive in this case. For the employer to make out this second prong, the plaintiff must have *unreasonably* failed to take advantage of the employer's preventive or corrective opportunities. *Starner*, 758 N.E.2d at 283. There is some evidence to suggest that the plaintiffs decided to cancel the meeting with Allen and to cease communications with Oberlin about the alleged harassment because they were afraid of the repercussions. Altenburger testified that Belachew said to the plaintiffs at the final meeting: "We don't want a witch hunt here, do we? And you must be very concerned about your jobs, aren't you?" We agree with the district court that there was a genuine issue of fact on the question of whether the plaintiffs' failure to follow the steps in the policy was reasonable. "[A]n employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment." *Thornton*, 530 F.3d at 457 (internal quotation marks omitted). A plaintiff may act reasonably, however, if her failure to take preventive or corrective measures was due to "a credible threat of retaliation." *Id.* (internal quotation marks omitted). There may or may not have been a credible threat here; there is a genuine dispute on that issue. Hence, Oberlin is not entitled to summary judgment on the basis of the affirmative defense.

As a result of the above analysis, Oberlin was not entitled to summary judgment on Fenderson's Chapter 4112 claim. We reverse the district court's contrary decision.

## IV.

Having so far addressed the potential liability of Holliday and Oberlin, we must next decide whether Bon Appetit could be liable, a result possible only if Bon Appetit was her

employer. *See* Ohio Rev. Code § 4112.02(A). The district court held that Bon Appetit was not her employer and that Bon Appetit was entitled to summary judgment on this basis. The plaintiffs fail to offer any arguments related to this issue on appeal. They have therefore abandoned any claim against Bon Appetit, *see McPherson*, 125 F.3d at 995–96, and we decline to reach the merits of the issue. We affirm the grant of summary judgment in Bon Appetit's favor.

V.

In addition to the Chapter 4112 claim, the plaintiffs raised several other claims: retaliation; breach of contract; negligent hiring, supervision, and retention; and "severe emotional distress." The district court granted summary judgment in the defendants' favor on all of these claims.

On appeal, the plaintiffs provide nothing more than a cursory reference to these claims. By failing to develop these arguments, Fenderson and the other plaintiffs have forfeited them. *See Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1063 (6th Cir. 2014); *Barany-Snyder v. Weiner*, 539 F.3d 327, 331 (6th Cir. 2008) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks omitted)). Again, the circumstances do not warrant our reaching the issues. We affirm the district court's grant of summary judgment on all of these claims.

VI.

For the foregoing reasons, we reverse the district court's decision granting summary judgment in favor of Oberlin College on Fenderson's Chapter 4112 claim. We remand for further proceedings on that single claim. We affirm the grant of summary judgment in favor of the defendants on all other claims.